**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| Robert Mossbruger, Michael Mossbruger, and Joseph Mossbruger, on behalf of themselves and all others similarly situated, <br><br>         Plaintiffs, <br><br>     v. <br><br> FCREI Properties, LLC d/b/a Ultra Modern Investments, <br><br>         Defendant. | CASE NO. <br><br> CLASS ACTION COMPLAINT <br><br> <u>JURY TRIAL DEMANDED</u> |

**Nature of this Action**

1.      Robert Mossbruger, Michael Mossbruger, and Joseph Mossbruger ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action against FCREI Properties, LLC d/b/a Ultra Modern Investments ("Defendant") under the Telephone Consumer Protection Act ("TCPA").

2.      Upon information and belief, Defendant routinely violate 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(c)(2) by delivering more than one advertisement or marketing telephone call to residential telephone numbers registered with the National Do-Not-Call Registry ("DNC Registry") without the prior express invitation or permission required by the TCPA.

**Parties**

3.      Robert Mossbruger is a natural person who at all relevant times resided in North Olmsted, Ohio.

4.      Michael Mossbruger is a natural person who at all relevant times resided in North Ridgeville, Ohio.

1

5.     Joseph Mossbruger is a natural person who at all relevant times resided in North Ridgeville, Ohio.

6.     Defendant is a Texas limited liability company that runs a marketing and real estate business that is headquartered in Dallas, Texas.

7.     Upon information and belief, one of Defendant's managing members, Raul Zavala, was a licensed real estate salesperson in California, with license number 01878277.

## Jurisdiction and Venue

8.     This Court has subject matter jurisdiction under 47 U.S.C. § 227(c)(5), and 28 U.S.C. § 1331.

9.     Venue is proper before this Court under 28 U.S.C. § 1391(b)(1) as Defendant resides in this district.

## Factual Allegations

10.    Robert Mossbruger is, and has been at all times relevant to this action, the regular and sole user of his cellular telephone number—(440) 668-XXXX.

11.    Robert Mossbruger uses his cellular telephone as his personal residential telephone number.

12.    Michael Mossbruger is, and has been at all times relevant to this action, the regular and sole user of his cellular telephone number—(440) 665-XXXX.

13.    Michael Mossbruger uses his cellular telephone as his personal residential telephone number.

14.    Joseph Mossbruger is, and has been at all times relevant to this action, the regular and sole user of his cellular telephone number—(440) 679-XXXX.

15.    Joseph Mossbruger uses his cellular telephone as his personal residential telephone number.

16.    In 2003, the Federal Communications Commission ("FCC") ruled that cellular telephone numbers that are placed on the DNC registry are presumed to be residential. *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14039 (2003).

17.    Robert Mossbruger registered his cellular telephone number with the DNC Registry on April 5, 2018, and has maintained that registration through the present date.

18.    Michael Mossbruger registered his cellular telephone number with the DNC Registry on November 13, 2004, and has maintained that registration through the present date.

19.    Joseph Mossbruger registered his cellular telephone number with the DNC Registry on February 21, 2008, and has maintained that registration through the present date.

20.    Beginning in early 2025, Robert Mossbruger started receiving numerous text messages from a rotating series of phone numbers from Defendant:



21. Michael Mossbruger experienced the same:



4

22. And, Joseph Mossbruger also experienced the same:



23.    Plaintiffs did not recognize the sender, were not selling their homes, and were not looking to sell their homes.

24.    Defendant characterizes itself as a "full service investment team specializing in Multifamily, Commercial, & Development Projects."[1]

25.    Through its communications to Plaintiffs advancing "proposals" or "offers" for their property, Defendant is coy as to the specific nature of its offerings to Plaintiffs, but implies that it seeks to buy the respective properties owned by Plaintiffs, despite that Plaintiffs were not seeking to sell their properties, were not listing them for sale, and certainly were not publishing invitations for "offers" or "proposals" for their property and requesting that businesses contact

---

[1]    https://www.facebook.com/UltraModernInvestments (last visited January 27, 2026).

Plaintiffs at their respective residential telephone numbers.

26.    Although Defendant's offer for real estate "proposals" for Plaintiffs' properties does not specifically clarify what it seeks to propose, a mix of consumer reviews, and Defendant's own public-facing representations, confirms the nature of Defendant's "proposals."

27.    Rather than purchase properties directly, Defendant, instead, seeks to solicit homeowners to permit Defendant to market their properties to third party investors to acquire, or to real estate brokers for conventional real estate representation.

28.    In a video on Defendant's Facebook page,[2] Defendant explains the nature of its offerings as an attempt to "maximize profits" for homeowners by either purchasing properties or collecting interested consumer leads for the submission to real estate agents, who would, in turn, be paid a commission for the representation of the homeowner for the sale:



29.    Upon information and belief, even for the properties Defendant represents that it

---

[2]    https://www.facebook.com/UltraModernInvestments/reels/ (last visited January 27, 2026).

will "purchase," Defendant does not actually "purchase the property," as it purports it would in its marketing materials.

30.     Rather, Defendant seeks to identify consumers who might be interested in selling a home, and then, once that consumer expresses willingness to transact with Defendant, Defendant places a non-binding offer on the property, and then remarkets the contract to purchase the property to third party investors without ever taking possession or title of the property.

31.     In doing so, if an interested purchaser emerges, Defendant then seeks to assign the purchase agreement to that investor, in exchange for a hefty fee that would be deducted from the fair market value of the property sold, and instead paid to Defendant via an assignment fee.

32.     Furthermore, in the event that Defendant fails to successfully remarket the property to third party investors, it instead reneges on the purchase agreement.

33.     In other words, Defendant does not purchase, nor seek to purchase, anything.

34.     Although anecdotal, consumer reviews highlights this very experience: [3]

---

[3]     https://www.trustpilot.com/review/ultra-investments.com (last visited January 27, 2026). Notably, although the link purports to reference "Ultra Investments" instead of "Ultra Modern Investments," the consumer reviews contained therein repeatedly reference "Ultra Modern Investments."



35.    In other words, for the interactions or transactions in which Defendant does not arrange for conventional real estate representation, Defendant enters into illusory purchase agreements that are only consummate if Defendant is able to successfully remarket the property to a third-party investor, in exchange for a fee paid to Defendant.

36.    Defendant further notes on its investor-facing website, under a heading "How Is

The Deal Structured?", that "We will have a formal closing with a 3rd party title company, title will place a mortgage on the property along with a promissory note, property insurance, title insurance & more to insure your investment is protected. If we fail to pay you, you will have the right to foreclose on the property."[4]

37.    Therefore, upon information and belief, Defendant is a real estate wholesaler, which is a strategy in which a wholesaler seeks to (1) persuade a homeowner to sell their home to the wholesaler at a substantial discount below fair market value, in exchange for a suite of services to ease the sale, then (2) prior to completing the purchase, remarket the property to third-party purchasers or investors, to (3) assign or sell the contract to that investor for a substantial premium, thereby allowing the investor to step into Defendant's shoes and acquire the house instead, with the difference in price solely allocated to Defendant as profit, instead of the homeowner.

38.    This conduct is precisely the subject of pending Ohio legislation—Senate Bill 192—a bill that will codify registration and disclosure requirements for wholesalers in the State of Ohio.[5]

39.    As Senator Brenner explained:

. . . problems arise when wholesalers engage in aggressive tactics to persuade homeowners to enter into such a contract. He said that wholesalers mislead homeowners into believing that the wholesaler is the one purchasing the property when, in reality, the wholesaler intends to sell the contract for a profit. If the wholesaler cannot find an investor to sell the contract to, Senator Brenner explained

---

[4]    https://ultramoderninvts.com/lending (last visited January 27, 2026).

[5]    https://www.legislature.ohio.gov/legislation/135/sb192/status (last visited January 27, 2026); *see also* https://www.legislature.ohio.gov//download?key=22901 (last visited January 27, 2026) (the Ohio Legislative Service Commission's Occupational Regulation Report for this bill, discussing wholesaling generally, including the bill's primary sponsor, Senator Andrew O. Brenner's testimony that the "Department of Commerce's Division of Real Estate and Professional Licensing has received reports of a concerning increase in wholesaling activity that involves predatory contracts, misleading sales tactics, clouding title to properties, and targeting susceptible homeowners.").

that the wholesaler will back out of the contract without closing, with few consequences.

If the closing proceeds, he testified that the homeowner then discovers that the actual purchaser is a third-party investor with whom the homeowner has never interacted. He also asserted that the homeowner finds that the sale price is well below fair market value, benefitting the wholesaler who makes a profit while depriving the homeowner of equity in the home. [6]

40.     In order to persuade a consumer to transact with Defendant—or one of its affiliate partners—in exchange for a below-fair market value offer on their home, Defendant offers to "handle all the paperwork and work with reputable title companies to ensure a smooth closing," [7] emphasizing that a homeowner will "not have to pay for any repairs, agents, or closing fees." [8]

41.     Defendant therefore necessarily offers to pair numerous services offered by a real estate agent—appraising the fair market value of the property, arranging for title and escrow services, preparing and completing purchase paperwork, and connecting the homeowner with third-party buyers—with its communications to Plaintiffs. [9]

42.     Upon information and belief, Defendant seeks to supplant the role of a traditional real estate agent while providing the same services as a real estate agent, and in exchange for doing so, is compensated by obtaining a homeowner's property at a reduced price, and thereafter selling it at an inflated price.

43.     Upon information and good faith belief, in exchange for providing these services,

---

[6]     *Id.* at 3.

[7]     https://ultramoderninvestments.com/ (last visited January 27, 2026).

[8]     https://ultramoderninvts.com/solutions (last visited January 27, 2026).

[9]     *See, e.g.*, https://www.liveabout.com/what-real-estate-agents-do-2866370 (last visited January 27, 2026) (noting that real estate agents assist home sellers by, among other things, "[d]etermin[ing[ the home's value in the current market"; "[c]oordinat[ing] the process from signing the contract to closing the deal, including scheduling inspections, preparing documents and other items necessary to close"; and "help[ing] the seller to try to get the price they want and to obtain a signed purchase agreement.").

Defendant seeks to pay—or find third party investors to pay—substantially below fair market value for the homes it seeks to purchase.

44.    As a result, Defendant would be (and, upon belief and information, is) compensated for its services in an analogous manner to a real estate agent: after providing services to facilitate the transaction, receiving compensation from the proceeds related to the buying or selling of a home.

45.    Moreover, in a since-abandoned trademark application, Defendant represented that its business was "Real estate agency services." [10]

46.    The FCC's guidance is particularly illuminating here. Congress charged the FCC with implementing the Federal Do-Not-Call rules. 47 U.S.C. § 227(c)(1). In 2005, the National Association of Realtors petitioned the FCC for an exemption from the Do-Not-Call rules' definition of "solicitation" for calls made by real estate agents to property owners with lapsed real estate listings, where the real estate agent solicits their services to a prospective seller. *In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 20 F.C.C. Rcd. 3788 (2005). In interpreting the definition of "telephone solicitation," the FCC rejected this proposed exemption, and concluded "that a telephone solicitation would include calls by real estate agents to property owners for the purpose of offering their services to the owner, whether the property listing has lapsed or not." *Id*. at 3793-94.

47.    In other words, the FCC has expressly declared that conduct materially similar to Defendant's conduct qualifies as a regulated telephone solicitation which accordingly means that Defendant must adhere to both 1) the DNC Registry; and 2) the requirement that a telemarketer obtain prior express written consent before sending any telemarketing or solicitation messages.

---

[10]    *See* Exhibit A.

11

48.    Upon information and belief, Defendant obtained Plaintiffs' respective contact information through the use of targeted address searches to identify corresponding homeowner names, and then skip-tracing or cross-referenced those names against phone numbers associated with those homeowner names, all the while not scrubbing those phone numbers against the DNC Registry.

49.    Plaintiffs did not give Defendant prior express consent or prior express written consent to send text messages to their telephone numbers.

50.    The text messages at issue were sent for non-emergency purposes.

51.    Upon information and good faith belief, the text messages at issue were sent by Defendant voluntarily.

52.    The purpose of the text messages at issue was to advertise and to market Defendant's business or services.

53.    Plaintiffs did not give Defendant prior express invitation or permission to send advertisement or marketing text messages to their telephone numbers.

54.    Plaintiffs suffered actual harm as a result of the text messages at issue in that they each suffered an invasion of privacy, an intrusion into their lives, and private nuisances.

55.    Upon information and good faith belief, Defendant knew, or should have known, that Plaintiffs registered their telephone numbers with the DNC Registry.

**Class Action Allegations**

56.    Plaintiffs bring this action under Federal Rule of Civil Procedure 23, and as a representative of the following class (the "Class"):

> All persons throughout the United States (1) to whom FCREI Properties, LLC delivered, or caused to be delivered, more than one text message within a 12-month period, promoting FCREI Properties, LLC's or its business partners', goods or services, (2) where the person's residential telephone number had been registered

with the National Do Not Call Registry for at least thirty days before FCREI Properties, LLC delivered, or caused to be delivered, at least two of the text messages within the 12-month period, (3) within four years preceding the date of this complaint through the date of class certification.

57.   Excluded from the Class is Defendant, its officers and directors, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendant has or had a controlling interest.

58.   Upon information and belief, the members of the Class are so numerous that joinder of all of them is impracticable.

59.   The exact number of members of the Class are unknown to Plaintiffs at this time, and can be determined only through appropriate discovery.

60.   The members of the Class are ascertainable because the Class is defined by reference to objective criteria.

61.   In addition, the members of the Class are identifiable in that, upon information and belief, their telephone numbers, names, and addresses can be identified in business records maintained by Defendant, and by third parties, including members of the Class.

62.   Plaintiffs' claims are typical of the claims of the members of the Class.

63.   As it did for all members of the Class, Defendant delivered solicitation text messages to Plaintiffs' telephone numbers more than thirty days after Plaintiffs registered their respective telephone numbers with the DNC Registry.

64.   Plaintiffs' claims, and the claims of the members of the Class, originate from the same conduct, practice, and procedure on the part of Defendant.

65.   Plaintiffs' claims are based on the same theories as are the claims of the members of the Class.

66.   Plaintiffs suffered the same injuries as the members of the Class.

67. Plaintiffs will fairly and adequately protect the interests of the members of the Class.

68. Plaintiffs' interests in this matter are not directly or irrevocably antagonistic to the interests of the members of the Class.

69. Plaintiffs will vigorously pursue the claims of the members of the Class.

70. Plaintiffs have retained counsel experienced and competent in class action litigation.

71. Plaintiffs' counsel will vigorously pursue this matter.

72. Plaintiffs' counsel will assert, protect, and otherwise represent the members of the Class.

73. The questions of law and fact common to the members of the Class predominate over questions that may affect individual members of the Class.

74. Issues of law and fact common to all members of the Class include:

a. Defendant's conduct, pattern, and practices as it pertains to delivering advertisement and telemarketing text messages;

b. For the Class, Defendant's practice of delivering text messages, for solicitation purposes, to telephone numbers already registered on the DNC Registry for more than thirty days;

c. Defendant's violations of the TCPA; and

d. The availability of statutory penalties.

75. A class action is superior to all other available methods for the fair and efficient adjudication of this matter.

76. If brought and prosecuted individually, the claims of the members of the Class would require proof of the same material and substantive facts.

77.    The pursuit of separate actions by individual members of the Class would, as a practical matter, be dispositive of the interests of other members of the Class, and could substantially impair or impede their ability to protect their interests.

78.    The pursuit of separate actions by individual members of the Class could create a risk of inconsistent or varying adjudications, which might establish incompatible standards of conduct for Defendant.

79.    These varying adjudications and incompatible standards of conduct, in connection with presentation of the same essential facts, proof, and legal theories, could also create and allow the existence of inconsistent and incompatible rights within the Class.

80.    The damages suffered by the individual member of the Class may be relatively small, thus, the expense and burden to litigate each of their claims individually make it difficult for the members of the Class to redress the wrongs done to them.

81.    The pursuit of Plaintiffs' claims, and the claims of the members of the Class, in one forum will achieve efficiency and promote judicial economy.

82.    There will be no extraordinary difficulty in the management of this action as a class action.

83.    Defendant acted or refused to act on grounds generally applicable to the members of the Class, making final declaratory or injunctive relief appropriate.

**Count I**
**Violation of 47 U.S.C. § 227(c)(5)**
**On behalf of the Class**

84.    Plaintiffs repeat and re-allege each and every factual allegation contained in paragraphs 1-83.

85.    A text message is a "call" as defined by the TCPA. *See, e.g.*, *Duran v. La Boom*

15

*Disco, Inc.*, 955 F.3d 279, 280 n.4 (2d Cir. 2020) ("It is undisputed that '[a] text message to a cellular telephone . . . qualifies as a 'call' within the compass of [the TCPA].'") (internal citation omitted); *Duron v. Kings Capital Holding LLC*, No. 3:25-cv-00149-DCG, 2026 U.S. Dist. LEXIS 6340, at *12 (W.D. Tex. Jan. 13, 2026) (same).

86.    The TCPA's implementing regulation, 47 C.F.R. § 64.1200(c), provides that "[n]o person or entity shall initiate any telephone solicitation" to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the federal government."

87.    Section 64.1200(e) provides that §§ 64.1200(c) and (d) "are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers."

88.    Any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may" may bring a private action based on a violation of those regulations, which were promulgated to protect telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object. 47 U.S.C. § 227(c).

89.    Defendant violated 47 C.F.R. § 64.1200(c) by initiating, or causing to be initiated, telephone solicitations to telephone subscribers such as Plaintiffs and the Class who registered their respective residential telephone numbers with the DNC Registry, which is a listing of persons who do not wish to receive telephone solicitations that is maintained by the federal government.

90.    Defendant violated 47 U.S.C. § 227(c)(5) because it delivered, or caused to be delivered, to Plaintiffs and the Class, more than one solicitation telephone call in a 12-month period in violation of 47 C.F.R. § 64.1200.

16

91.    As a result of Defendant's violations of 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200, Plaintiff, and the members of the Class, are entitled to damages in an amount to be proven at trial.

**Prayer for Relief**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

a.    Determining that this action is a proper class action;

b.    Designating Plaintiffs as class representatives of the proposed Class under Federal Rule of Civil Procedure 23;

c.    Designating Plaintiffs' counsel as class counsel under Federal Rule of Civil Procedure 23;

d.    Adjudging and declaring that Defendant violated 47 U.S.C. § 227(c)(5);

e.    Enjoining Defendant from continuing their violative behavior, including continuing to deliver solicitation text messages to telephone numbers registered with the DNC Registry for at least thirty days;

f.    Awarding Plaintiffs and the members of the Class damages under 47 U.S.C. § 227(c)(5)(B);

g.    Awarding Plaintiffs and the members of the Class treble damages under 47 U.S.C. § 227(c)(5)(C);

h.    Awarding Plaintiffs and the members of the Class reasonable attorneys' fees, costs, and expenses under Rule 23 of the Federal Rules of Civil Procedure;

i.    Awarding Plaintiffs and the members of the Class any pre-judgment and post-judgment interest as may be allowed under the law; and

j.      Awarding such other and further relief as the Court may deem just and proper.

**Demand for Jury Trial**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all triable issues.

Date: March 19, 2026.

/s/ Bryan A. Giribaldo
Bryan A. Giribaldo
Texas Bar No. 24124547
Alex D. Kruzyk* (to seek admission)
Texas Bar No. 24117430
**PARDELL, KRUZYK & GIRIBALDO, PLLC**
7500 Rialto Blvd., Suite 1-250
Austin, Texas 78735
Tele: (561) 726-8444
bgiribaldo@pkglegal.com
akruzyk@pkglegal.com

*Counsel for Plaintiffs and the proposed class*

## CERTIFCATE OF COMPLIANCE WITH LOCAL RULE 83.10

In light of Local Rule 83.10(a), the undersigned, Bryan A. Giribaldo, Esq., certifies that he resides in Dallas, Texas and that his residence is located within 50 miles of the courthouse for the Dallas Division of the Northern District of Texas. *See, e.g.*, *Atari Interactive Inc v. State Farm Mutual Automobile Insurance Company et al.*, Case No. 3:24-cv-00704-D, ECF No. 50 ("The court has determined that Bryan A. Giribaldo, Esquire, satisfies the local counsel requirement based on his Dallas residence.").

Date: March 19, 2026.

/s/ Bryan A. Giribaldo
Bryan A. Giribaldo

18