**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| Robert Mossbruger, Michael Mossbruger, and Joseph Mossbruger, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FCREI Properties, LLC d/b/a Ultra Modern Investments,<br><br>Defendant. | CASE NO. 3:26-cv-00889-O |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR RESPONSE IN OPPOSITION TO DEFENDANT FCREI PROPERTIES, LLC D/B/A ULTRA MODERN INVESTMENTS' MOTION TO DISMISS**

## Table of Contents


Introduction .......... 1

Factual Background .......... 2

Standard of Law .......... 3

Argument .......... 3

I. Defendant's communications plausibly qualify as solicitations under the TCPA. .......... 3

II. The TCPA's private right of action applies to text messages. .......... 10

A. Every court to consider this issue in the Fifth Circuit post-*McLaughlin* has held the same: "text messages" still qualify as "calls" under the TCPA. .......... 11

B. In addition to the unanimous view of courts in the Fifth Circuit post-*McLaughlin*, several substantive reasons support text messages qualifying as "calls" under the TCPA. .......... 15

III. There is a private right of action under the TCPA for violations of the DNC Registry, and that has been the case for decades. .......... 19

A. Defendant's argument that the FCC's failure to implement the DNC Registry in 1992 precluded its later implementation is flatly rejected by Supreme Court precedent. .......... 19

B. The 2003 Do-Not-Call Implementation Act, the FCC's 2003 implementation of the DNC Registry, and decades of caselaw make clear that the DNC Registry is and was enacted pursuant to the FCC's authority under § 227(c). .......... 21

Conclusion .......... 25

# Table of Authorities

## Cases

*Alvarez v. Fiesta Nissan, Inc.*, No. 7:25-CV-00343, 2026 U.S. Dist. LEXIS 14155 (S.D. Tex. Jan. 26, 2026) .... 13

*Aussieker v. Aghazadeh*, 2025 U.S. Dist. LEXIS 137718 (N.D. Cal. Jul. 18, 2025).... 9

*Barnhart v. Peabody Coal Co.* 537 U.S. 149 (2003).... 20

*Barr v. Am. Ass'n of Political Consultants*, 591 U.S. 610 (2020) .... 25

*Barton v. JMS Assoc. Mktg., LLC*, No. 21-35836, 2023 U.S. App. LEXIS 3593 (9th Cir. Feb. 15, 2023).... 24

*Bosley v. A Bradley Hosp. LLC*, No. 25-cv-22336, 2025 U.S. Dist. LEXIS 183986 (S.D. Fla. Sep. 18, 2025).... 15

*Bradford v. Sovereign Pest Control of Tx., Inc.*, 744 F. Supp. 3d 754 (S.D. Tex. 2024) .... 5

*Bramlett v. Res. 360 LLC*, No. 1:25-cv-3312-MLB, 2026 U.S. Dist. LEXIS 43946 (N.D. Ga. Mar. 4, 2026) .... 7, 10

*Brock v. Pierce Cty.*, 476 U.S. 253 (1986) .... 20

*Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195 (S.D.N.Y. 2024).... 4

*Callier v. Am. Auto Grp. Ltd. Liab. Co.*, No. 3:25-CV-00231-LS-MAT, 2026 U.S. Dist. LEXIS 120642 (W.D. Tex. May 29, 2026) .... 14

*Callier v. Settle Fast McA, Ltd. Liab. Co.*, No. 3:24-CV-00461-KC, 2026 U.S. Dist. LEXIS 10096 (W.D. Tex. Jan. 20, 2026) .... 25

*Callier v. United Fundings Ltd. Liab. Co.*, No. 3:24-CV-00363-LS-MAT, 2026 U.S. Dist. LEXIS 83725 (W.D. Tex. Apr. 15, 2026).... 12

*Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016) .... 18

*Carroll v. SGS N. Am., Inc.*, No. 16-537-SDD-RLB, 2017 U.S. Dist. LEXIS 154170 (M.D. La. Sep. 21, 2017).... 5

*Chesbro v. Best Buy*, 705 F.3d 913 (9th Cir. 2012) .... 5, 6

*Chinitz v. Intero Real Estate Servs.*, No. 18-cv-05623-BLF, 2021 U.S. Dist. LEXIS 70436 (N.D. Cal. Apr. 12, 2021) .... 4

*Coffey v. Fast Easy Offer LLC*, 2025 U.S. Dist. LEXIS 106786 (D. Ariz. Jun. 5, 2025).... 9

*Coffey v. Fast Easy Offer, LLC*, No. 25-4066, 2026 U.S. App. LEXIS 16209 (9th Cir. June 4, 2026)........................................................................................................ 7, 9

*Cole v. C/T Install Am., LLC*, No. 25-3531, 2026 U.S. Dist. LEXIS 63254 (E.D. Pa. Mar. 23, 2026)........................................................................................................ 14

*Cordoba v. DIRECTV, LLC*, 942 F.3d 1259 (11th Cir. 2019)........................................ 24

*Crouch v. Reg'l Acceptance Corp.*, No. 3:25-cv-2162-G-BN, 2026 U.S. Dist. LEXIS 52446 (N.D. Tex. Feb. 11, 2026) .................................................................................... 11

*Cupp v. TA Fintech, Inc.*, No. 25-cv-07479, 2026 U.S. Dist. LEXIS 66678 (N.D. Cal. Mar. 27, 2026); .................................................................................................... 15

*Cupp v. Ta Fintech, Inc.*, No. 25-cv-07479-TSH, 2026 U.S. Dist. LEXIS 120944 (N.D. Cal. June 1, 2026) ............................................................................................. 14

*Dilanyan v. Hugo Boss Fashions, Inc.*, No. 2:25-cv-05093-JLS-BFM, 2025 U.S. Dist. LEXIS 254358 (C.D. Cal. Dec. 3, 2025)........................................................................ 15

*Duron v. Kings Capital Holding LLC*, No. 3:25-cv-00149-DCG, 2026 U.S. Dist. LEXIS 6340 (W.D. Tex. Jan. 13, 2026)................................................................................ 12

*Eagle v. GVG Capital, LLC*, No. 22-cv-00638-SRB, 2023 U.S. Dist. LEXIS 15834 (W.D. Mo. Jan. 31, 2023) ........................................................................................ 4, 7, 8

*Esquivel v. Mona Lee, Inc.*, No. 3:25-cv-00607-H-BLM, 2025 U.S. Dist. LEXIS 230841 (S.D. Cal. Nov. 24, 2025) ................................................................................. 15

*Est. of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469 (1992) ....................................... 18

*Glasel v. Office Depot, LLC*, No. 9:24-cv-80910-WPD, 2025 U.S. Dist. LEXIS 231053 (S.D. Fla. Nov. 25, 2025)........................................................................................ 15

*Golan v. Veritas Entm't, LLC*, 788 F.3d 814 (8th Cir. 2015) ........................................ 6

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014).............................. 18

*Haynes v. Everett Fin. Inc.*, No. 4:26-CV-00091-O, 2026 U.S. Dist. LEXIS 46419 (N.D. Tex. Mar. 6, 2026)................................................................................................ 3

*Helfrich v. Raven3 Home Buyers LLC*, No. 22-CV-03529 (PMH), 2023 U.S. Dist. LEXIS 162531 (S.D.N.Y. Sep. 13, 2023) ......................................................................... 8

*Hernandez v. Bedford Dental L.L.C.*, No. 25 CV 6787, 2026 U.S. Dist. LEXIS 23208 (N.D. Ill. Feb. 4, 2026)................................................................................................ 14

*Howard v. Republican Nat'l Comm.*, 164 F.4th 1119 (9th Cir. 2026)........................... 14

*Hunsinger v. Dynata LLC*, No. 3:22-cv-00136-G-BT, 2023 U.S. Dist. LEXIS 37879 (N.D. Tex. Feb. 7, 2023)....................................................................................................... 25

*Hunsinger v. Offer, LLC*, Civil Action No. 3:21-CV-2846-BH, 2022 U.S. Dist. LEXIS 234862 (N.D. Tex. Dec. 7, 2022)....................................................................................... 9

*Jance v. Homerun Offer, LLC*, 2021 U.S. Dist. LEXIS 143145 (D. Ariz. Jul. 30, 2021) ............. 9

*Johnson v. Lumpkin*, 76 F.4th 1037 (5th Cir. 2023) .................................................................. 11

*Jones v. Montachusetts Reg'l Transit Auth.*, No. 22-1569, 2023 U.S. App. LEXIS 35000 (1st Cir. Nov. 30, 2023)...................................................................................................... 24

*King v. Charge*, No. 25-cv-00105-SB, 2025 U.S. Dist. LEXIS 267318 (D. Del. Dec. 30, 2025)............................................................................................................................. 14

*Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643 (4th Cir. 2019) ............................................... 24

*Lorillard, Div. of Loew's Theatres, Inc. v. Pons*, 434 U.S. 575 (1978)....................................... 16

*Mancilla v. Ultimate Fitness Grp. LLC*, No. CV-24-00568-TUC-RM (JR), 2026 U.S. Dist. LEXIS 13677 (D. Ariz. Jan. 26, 2026)............................................................................ 15

*McGonigle v. Shopperschoice.com, L.L.C.*, No. 25-152-SDD-RLB, 2026 U.S. Dist. LEXIS 30157 (M.D. La. Feb. 13, 2026)............................................................................... 14

*McGonigle. v. Office Depot, LLC.*, No. 25-80069-CIV-DIMITROULEAS, 2025 U.S. Dist. LEXIS 231061 (S.D. Fla. Nov. 25, 2025)........................................................................ 15

*McLaughlin Chiropractic Assocs. v. McKesson Corp.*, 606 U.S. 146 (2025) ............................. 11

*McMorrow v. Core Props., LLC*, No. 4:23-cv-00126-JAR, 2023 U.S. Dist. LEXIS 223207 (E.D. Mo. Dec. 15, 2023).............................................................................................. 4, 8, 9

*Mey v. Liberty Home Guard, LLC*, No. 5:23-CV-281, 2026 U.S. Dist. LEXIS 739 (N.D.W. Va. Jan. 5, 2026) ..................................................................................................................... 14

*Miller v. Comm'r of Soc. Sec.*, Civil Action No. 4:21-cv-01007-O-BP, 2023 U.S. Dist. LEXIS 97070 (N.D. Tex. June 5, 2023) ........................................................................................ 18

*Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368 (2012)............................................................ 24

*Moonsawmy v. JWS Acquisitions, LLC* No. 1:23-cv-04198-LMM, 2024 U.S. Dist. LEXIS 246877 (N.D. Ga. July 18, 2024) ........................................................................................ 8

*Mujahid v. Newity, LLC*, No. 25 C 8012, 2025 U.S. Dist. LEXIS 221088 (N.D. Ill. Nov. 10, 2025)............................................................................................................................. 14

*Murray v. Grocery Delivery E-Services USA Inc.*, 55 F.4th 340 (1st Cir. 2022) ......................... 24

*Newell v. Child.'s Dental Health Assocs., LLC*, No. 25-5238, 2026 U.S. Dist. LEXIS 74360 (E.D. Pa. Apr. 6, 2026) ... 14

*Overstreet ex rel. NLRB*, 668 F. Supp. 2d 988 (W.D. Tex. 2009) ... 16

*Pepper v. GVG Capital LLC*, No. H-22-2912, 2023 U.S. Dist. LEXIS 100425 (S.D. Tex. June 9, 2023) ... 4, 8, 10

*Rabbitt v. Rohrman Midwest Motors, Inc.*, No. 25 C 11312, 2026 U.S. Dist. LEXIS 66266 (N.D. Ill. Mar. 27, 2026) ... 15, 18

*Rocha v. All Things Go, LLC*, No. 1:25-cv-00741-JLT-SAB, 2026 U.S. Dist. LEXIS 33294 (E.D. Cal. Feb. 18, 2026) ... 15

*Rubin v. Staples, Inc.*, No. 2:2545515 (WJM), 2026 U.S. Dist. LEXIS 70359 (D.N.J. Mar. 31, 2026) ... 14

*Schulz v. Infogroup, Inc.*, Civil Action No. 3:19-CV-1620-N, 2020 U.S. Dist. LEXIS 128908 (N.D. Tex. July 21, 2020) ... 5, 9

*Soale v. eXp Realty LLC*, No. CV-25-00773-PHX-GMS, 2026 U.S. Dist. LEXIS 47597 (D. Ariz. Mar. 9, 2026) ... 15

*Starling v. J Wales Home Sols. LLC*, Civil Action No. 4:21-cv-01261-O, 2022 U.S. Dist. LEXIS 71382 (N.D. Tex. Apr. 19, 2022) ... 24

*Taylor v. Cider (US) Holding Ltd.*, No. 25-cv-24496, 2026 U.S. Dist. LEXIS 6252 (S.D. Fla. Jan. 13, 2026) ... 15

*Texas v. United States EPA*, 156 F.4th 523 (5th Cir. 2025) ... 21

*United States* v. *James Daniel Good Real Property*, 510 U.S. 43 (1993) ... 21

*Watkins v. EyeBuyDirect, Inc.*, No. 1:25-CV-538-RP, 2025 U.S. Dist. LEXIS 167479 (W.D. Tex. Aug. 28, 2025) ... 11

*Wilcox v. Marketpro S., Inc.*, No. SAG-23-2364, 2023 U.S. Dist. LEXIS 226347 (D. Md. Dec. 20, 2023) ... 8

*Wilson v. Better Mortg. Corp.*, 811 F. Supp. 3d 631 (S.D.N.Y. 2025) ... 14

*Wilson v. Easy Spirit, LLC*, No. 3:25-CV-112 (SFR), 2026 U.S. Dist. LEXIS 69059 (D. Conn. Mar. 31, 2026) ... 14

*Wilson v. MEDVIDI Inc.*, No. 5:25-cv-03996-BLF, 2025 U.S. Dist. LEXIS 198827 (N.D. Cal. Oct. 7, 2025) ... 15

*Wilson v. Mountainside Fitness Acquisition LLC*, No. CV-25-01481-PHX-MTL, 2026 U.S. Dist. LEXIS 4157 (D. Ariz. Jan. 9, 2026) ... 15

*Wilson v. Skopos Fin., LLC*, No. 6:25-cv-00376-MC, 2025 U.S. Dist. LEXIS 138638 (D. Or. July 21, 2025) ........ 15

*Wis. Cent. Ltd. v. United States*, 585 U.S. 274 (2018) ........ 16

**Statutes**

15 U.S.C. § 6153 ........ 20, 21, 22, 23

47 U.S.C. § 227(a)(4) ........ 3, 5

47 U.S.C. § 227(c) ........ 11, 19, 23

47 U.S.C. § 227(e) ........ 17

*Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act,* PL 116-105 (December 30, 2019) ........ 14

**Other Authorities**

137 Cong. Rec. S18784 (1991) ........ 17

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 17 FCC Rcd 17459 (Sept. 18, 2002) ........ 22

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd 14014 (July 3, 2003) ........ 15, 22

*In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 20 F.C.C. Rcd. 3788, 3793-94 (2005) ........ 4

Merriam-Webster's Third New International Dictionary (Philip Babcock Gove et al., eds., 7th prtg. 1993) ........ 5

Oxford English Dictionary, 2d Ed. (1989) ........ 16

Paging Network, Inc., Annual Report, at 8 (1993), available at https://digital.library.mcgill.ca/images/hrcorpreports/pdfs/6/639549.pdf ........ 18

Pub. L. No. 111-331 (December 22, 2010) ........ 15

Pub. L. No. 109-21 (July 9, 2005) ........ 15

Pub. L. No. 114-74 (November 2, 2015) ........ 15

Pub. L. No. 116-105 (December 30, 2019) ........ 16

Rodney A. Smolla, *The "Do-Not-Call List" Controversy: A Parable of Privacy and Speech*, 38 Creighton L. Rev. 743 (2005) ........ 20, 22

The New Merriam-Webster Dictionary (1989) .................................................................. 16

Webster's Third New International Dictionary 318 (1981)........................................................ 16

**Regulations**

47 C.F.R. § 64.1200 ........................................................................................................... 5, 23

## Introduction

FCREI Properties, LLC d/b/a Ultra Modern Investments ("Defendant") is an unrepentant and committed cold-call telemarketer that believes it is entitled to completely ignore the National Do-Not-Call Registry ("DNC Registry"). As part of its telemarketing campaign, Defendant began inundating Robert Mossbruger, Michael Mossbruger, and Joseph Mossbruger (collectively, "Plaintiffs") with unwanted telemarketing messages offering "proposals" for their homes and property—proposals to either provide conventional real estate representation to sell their homes, or to negotiate a provisional purchase of their homes, and thereafter remarket that contract to third-party investors. Defendant did this, despite that Plaintiffs: (1) did not want to sell their respective homes; (2) did not contact Defendant or provide it with their prior express consent; and (3) despite that they each had registered their telephone numbers on the DNC Registry long before receiving Defendant's cold-call communications. This is not a case of mistaken identities or wrong numbers, a rogue third-party telemarketer, or a debate over a questionable submission of consent. Simply, Defendant thinks it can ignore the DNC Registry, and can do so absolutely.

Defendant contends that there is *nothing* Plaintiffs can do about this, because Defendant believes it avoided needing to comply with the Telephone Consumer Protection Act ("TCPA"). Defendant bases this assertion on three arguments: 1) that text messages are no longer regulated by the TCPA's DNC Registry provisions—despite *all authority in this Circuit consistently rejecting that argument*; 2) that the real estate proposals advanced by Defendant are not "telemarketing"—again despite in-Circuit authority holding otherwise; and 3) a somewhat confusing argument that violations of the DNC Registry are illusory and have no private right of action—with no citation to any caselaw whatsoever. The Court should reject each of these arguments, and deny Defendant's motion to dismiss in its entirety.

## Factual Background

Plaintiffs are brothers who each reside in, and own property in, the state of Ohio. *See* ECF No. 1 at ¶¶ 3-5. From 2025 through the present, Plaintiffs each started to become inundated with unwanted cold-call text messages from Defendant, inquiring if Plaintiffs wanted to sell their respective homes, and offering "proposals" for their properties. *Id.* at ¶¶ 20-22. Critical, then, is that Plaintiffs each had registered their respective phone numbers on the DNC Registry years before Defendant began its telemarketing campaign, *see id.* at ¶¶ 17-19, and that Plaintiffs never attempted to sell their properties, nor did they give Defendant their prior express consent to send telemarketing communications to their respective telephone numbers. *Id.* at ¶¶ 23, 49.

Defendant is a real estate business that appears to operate in two distinct arenas. First, it acts as a real estate wholesaler, through which it seeks for homeowners to execute an agreement to sell their property to Defendant in exchange for Defendant handling all aspects of the transaction traditionally performed by a real estate agent, such as appraisals, arranging escrow and title services, and completing paperwork. *Id.* at ¶¶ 26-29, 36-41. Then, if the homeowner expresses interest in such a transaction, Defendant would then remarket the *contract* to third party investors, and would assign the contract to those investors for a fee—which Defendant would pocket—or, if unable to obtain such a fee, would cancel the contract with the homeowner. *Id.* at ¶¶ 30-35. In exchange for providing these various services, Defendant would offer a substantially reduced payment for the homeowner's property—far below fair market value. *Id.* at ¶¶ 42-43.

Alternately—and an allegation that Defendant fails to address whatsoever—Defendant also seeks to identify consumers interested in conventional real estate representation and thereafter refer those consumer leads to real estate agents for conventional representation, in which the agent would be paid a percentage commission on the transaction. *Id.* at ¶¶ 27-28. Either way, Defendant

would be paid by the homeowner, either via a commission on a sale, or by allowing Defendant to arbitrage their home and assign it to a third-party purchaser. *See generally id.*

**Standard of Law**

This Court explained the standard for motions to dismiss in *Haynes v. Everett Fin. Inc.*:

> To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead enough facts to state a claim to relief that is "plausible on its face." A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Unlike a "probability requirement," the plausibility standard demands "more than a sheer possibility that a defendant has acted unlawfully." Where a complaint contains facts that are "merely consistent with" the defendant's liability, it "stops short of the line between possibility and plausibility" beyond which relief would be entitled.
>
> In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. But the court may not accept legal conclusions as true. The Court is not bound to accept legal conclusions as true, and only a complaint that states a plausible claim for relief survives a motion to dismiss. When there are well-pleaded factual allegations, the Court assumes their veracity and then determines whether they plausibly give rise to an entitlement to relief.

No. 4:26-CV-00091-O, 2026 U.S. Dist. LEXIS 46419, at *3-4 (N.D. Tex. Mar. 6, 2026).[1]

**Argument**

**I. Defendant's communications plausibly qualify as solicitations under the TCPA.**

To qualify as a prohibited "solicitation" or "telemarketing," a plaintiff is required to allege that the messages at issue constitute an offer "for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 U.S.C. § 227(a)(4). Plaintiffs allege that Defendant's text messages are precisely that. Specifically, Plaintiffs allege that Defendant's text messages—which on their face are "offers" or "proposals" to purchase Plaintiffs' homes—are not merely offers to purchase. Rather, they are solicitations in one of two ways: either (1) Defendant

[1] Unless otherwise indicated, all emphasis is added, and all internal citations are omitted.

submits interested consumer leads to real estate agents—perhaps themselves, as at least some of Defendant's employees are themselves licensed agents—for conventional real estate representation; or (2) by wholesaling Plaintiffs' properties. *See* ECF No. 1 at ¶¶ 26-43.

First and foremost, real estate representation is the sale of services, as courts in this Circuit, the FCC, and others nationwide uniformly concur. *See, e.g.*, *Pepper v. GVG Capital LLC*, 677 F. Supp. 3d 638, 641 (S.D. Tex. 2023) ("Pepper's allegations that GVG Capital provides the necessary services associated with a real estate transaction, and that the seller effectively pays for those services through GVG Capital's payment of a discounted purchase price, are sufficient to state a claim."); *Chinitz v. Intero Real Estate Servs.*, No. 18-cv-05623-BLF, 2021 U.S. Dist. LEXIS 70436, at *22 (N.D. Cal. Apr. 12, 2021) (denying motion to dismiss involving telemarketing calls for real estate leads); *In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 20 F.C.C. Rcd. 3788, 3793-94 (2005) ("a telephone solicitation would include calls by real estate agents to property owners for the purpose of offering their services to the owner.").[2]

Perhaps acknowledging this reality, Defendant seeks to instead apply a self-serving and unsupported standard that *the communications themselves* must contain explicit offers of services for sale to qualify as telemarketing or solicitation messages, as they argue that "[t]he messages contain no such language" demanding "payment of some sort of fee for an underlying service." ECF No. 11 at 10. But this is rejected by both the text of the TCPA, and Fifth Circuit precedent.

Beginning with the text: Congress defined "telephone solicitation" as "the initiation of a

---

2 *See also Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195, 210 (S.D.N.Y. 2024) ("Courts have straightforwardly held that a person who is solicited to pay a portion of his ultimate sales price to an agent in exchange for listing services has purchased a service.") (collecting cases); *McMorrow v. Core Props., LLC*, No. 4:23-cv-00126-JAR, 2023 U.S. Dist. LEXIS 223207, at *35 (E.D. Mo. Dec. 15, 2023); *Eagle v. GVG Capital, LLC*, No. 22-cv-00638-SRB, 2023 U.S. Dist. LEXIS 15834, at *8 (W.D. Mo. Jan. 31, 2023).

telephone call or message *for the purpose of* encouraging the purchase…of…services." 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(15). The plain meaning of this definition is unambiguous: when assessing whether a particular telephone communication violates the TCPA, the Court must examine a caller's *intentions*—the "purpose of his message"—not the content of his messages, their effect or impact on the recipient, or "the caller's characterization of the call." *Chesbro v. Best Buy*, 705 F.3d 913 (9th Cir. 2012); *see also* Merriam-Webster's Third New International Dictionary (Philip Babcock Gove et al., eds., 7th prtg. 1993) at 1847 ("purpose" is "an object to be attained: an end or aim"). Put another way, the caller's *subjective* intention, not the specific words of his message, are what matters.

And courts within the Fifth Circuit agree: the analysis is not limited to the literal text of the messages, because "Courts look to both the content and context of calls to determine whether they were made with the requisite telemarketing 'purpose.'" *Schulz v. Infogroup, Inc.*, Civil Action No. 3:19-CV-1620-N, 2020 U.S. Dist. LEXIS 128908, at *4-5 (N.D. Tex. July 21, 2020) (Godbey, J.). "Generally speaking, courts tend to approach the question of whether a message constitutes advertising or telemarketing 'with a measure of common sense.'" *Bradford v. Sovereign Pest Control of Tx., Inc.*, 744 F. Supp. 3d 754, 760 (S.D. Tex. 2024); *see also Carroll v. SGS N. Am., Inc.*, No. 16-537-SDD-RLB, 2017 U.S. Dist. LEXIS 154170, at *9 (M.D. La. Sep. 21, 2017) (same, denying summary judgment to defendant).

This same principle holds true in multiple Circuit Courts. In *Chesbro*, the Ninth Circuit held that common sense—not clever drafting—controls. The Ninth Circuit emphasized that when assessing whether a particular telephone communication violates the TCPA, courts must examine a caller's *intentions*—the "purpose of his message"—not the content of the messages or "the caller's characterization of the call." 705 F.3d at 918. More particularly, *Chesbro* involved

robocalls from Best Buy that reminded customers that their Best Buy rewards "points" were going to expire. *Id.* at 916-17. The calls "urged the listener to 'redeem' his Reward Zone points, directed him to a website where he could further engage with the [points], and thanked him for 'shopping at Best Buy.'" *Id.* The scripts of these calls "did not explicitly reference any. . . goods, or services." *Id.* at 918. Nevertheless, the Ninth Circuit held that the robocalls constituted "telemarketing" under the TCPA because (1) the calls urged the listener to redeem "points" at Best Buy, and (2) "[t]here was no other use for the . . . points" besides purchasing Best Buy products." *Id.* at 918. As this Court explained, "[n]either the statute nor the regulations require an explicit mention of a good, product, or service where the implication is clear *from the context*." *Id.*

As another example, the Eighth Circuit reached a similar conclusion in *Golan v. Veritas Entm't, LLC*, which held that a series of unsolicited voicemails constituted "telemarketing" even when the content of the messages themselves gave no hints as to the caller's ultimate goal. 788 F.3d 814 (8th Cir. 2015). There, the plaintiffs received two voicemails, each with the same cryptic message: "Liberty. This is a public survey call. We may call back later." *Id.* at 816. The plaintiffs discovered that many others had received similar calls, and that those who picked up were treated to a pre-recorded message promoting a movie on the eve of its release in theaters. *Id.* The defendants argued that the court "should consider only the content of the calls" the plaintiffs received, which made no overt reference to the movie promotion. *Id.* at 820. The court "refuse[d] to do so." *Id.* Instead, it invoked *Chesbro* for the proposition that the TCPA governs messages whose "improper purpose is 'clear from the context.'" *Id.* Because "the calls were initiated and transmitted to the Golans *in order to* promote Last Ounce of Courage," they were forbidden "solicitations" "even though the messages never referenced the film." *Id.*

With this clarification in place, it is clear from Plaintiffs' allegations that Defendant's

messages about "proposals" for Plaintiffs' homes, made by licensed real estate agent(s), for the dual purpose of providing either conventional real estate listing and services, or wholesaling their property, meets the requisite definition of a solicitation under the TCPA. *Accord Bramlett v. Res. 360 LLC*, No. 1:25-cv-3312-MLB, 2026 U.S. Dist. LEXIS 43946, at *4 (N.D. Ga. Mar. 4, 2026) (denying motion to dismiss where "Defendants counter that their text messages did not explicitly mention any real estate services. But the TCPA does not 'require an explicit mention of a . . . service' where 'the context' plausibly suggests the caller was trying to sell services to the recipient."). Given that Defendant openly touts that it seeks to provide or refer interested homeowners to conventional real estate representation—supported by videos posted by Defendant, trademark filings, and flatly unrefuted in its motion—the analysis regarding the telemarketing question can end here. ECF No. 1 at ¶¶ 28, 45; *see also Coffey v. Fast Easy Offer, LLC*, No. 25-4066, 2026 U.S. App. LEXIS 16209, at *10 (9th Cir. June 4, 2026) (reversing district court granting of motion to dismiss on similar facts, because "one purpose for which [d]efendants initiated these messages was to encourage the purchase of real estate brokerage services.").

However, even if Defendant did not offer conventional real estate representation or referrals, its wholesaling efforts would *still* qualify as telemarketing. In *Eagle*, the plaintiff brought claims under the TCPA against a mass-marketing homebuyer who sent repeated text messages to her cellular telephone number, absent prior express written consent, for the purposes of inquiring regarding the plaintiff's interest in selling her home. 2023 U.S. Dist. LEXIS 15834, at *7. The defendant moved to dismiss, arguing, in relevant part, that the text messages were not "telemarketing" or "solicitations" because "Defendant argues that it 'is alleged to have made an offer to buy [the plaintiff's] property, pure and simple. As [the defendant] is not alleged to have sent texts encouraging Plaintiff to buy or rent anything, it did not make a telephone solicitation.'"

*Id.* at *6. However, the court found that the allegation that the defendant necessarily bundled ancillary services with the purchase of a home—as Defendant does here—and that the defendant sold interested consumer leads to third-party purchasers, sufficiently stated a claim. *Id.* at *7-9.

Critically, following *Eagle*, in *Pepper v. GVG Cap. LLC*, Judge Rosenthal of the Southern District of Texas similarly denied a motion to dismiss based on the same issues present here. 677 F. Supp. 3d 638 (S.D. Tex. 2023). There, the court expanded on the holding in *Eagle*, concluding:

> Pepper's allegations that GVG Capital provides the necessary services associated with a real estate transaction, and that the seller effectively pays for those services through GVG Capital's payment of a discounted purchase price, are sufficient to state a claim. Unlike repairs made to the property, the transfer of title is part of the sale transaction. To sell property, one or both parties to the sale must pay certain transaction costs. Pepper alleges that GVG Capital pays those costs out of the funds that would otherwise be paid to the seller. GVG Capital argues that this "effective fee" is not an "actual fee." This argument makes a distinction without a difference—Pepper would pay that fee whether she made the payment directly or indirectly, by discounting the sale price.

*Id.* at 642; *see also Helfrich v. Raven3 Home Buyers LLC*, No. 22-CV-03529, 2023 U.S. Dist. LEXIS 162531, at *7-8 (S.D.N.Y. Sep. 13, 2023) (same); *Wilcox v. Marketpro S., Inc.*, No. SAG-23-2364, 2023 U.S. Dist. LEXIS 226347, at *7 (D. Md. Dec. 20, 2023) (same); *Moonsawmy v. JWS Acquisitions, LLC* No. 1:23-cv-04198-LMM, 2024 U.S. Dist. LEXIS 246877 (N.D. Ga. July 18, 2024) (same).

Finally, the court in *McMorrow* granted *summary judgment* on this issue in favor of a plaintiff advancing materially identical claims against real estate telemarketers that believed, like Defendants here, that they could ignore the TCPA and DNC Registry. 2023 U.S. Dist. LEXIS 223207. The defendants argued that their text messages were not solicitations nor telemarketing because their purpose was simply to gauge Plaintiff's interest in selling his real property and/or to offer to purchase Plaintiff's home. *Id.* at *5. The plaintiff, on the other hand, argued that the defendants collected an "effective fee" for providing homeowners with services associated with

selling property. *Id.* In reaching the conclusion "that the text messages at issue here were 'solicitations' and/or 'telemarketing' as defined by the TCPA," the court in *McMorrow* first examined whether the defendants were providing services along with their offers to purchase, and then examined whether those services were accompanied by either an actual or an "effective" fee. *Id.* at *36. The *McMorrow* court found that the real estate telemarketer implicitly offered real estate-related services through its communications, and sought compensation for providing them via the offer of a reduced payment in exchange for those services—an "effective fee." *Id.* at *34.

Defendant cites a handful of cases holding otherwise. The bundle of decisions it cites from the Ninth Circuit represent a minority view, and notably, the decision in which those matters rely, *Coffey v. Fast Easy Offer LLC*, was just overturned on appeal regarding this very issue. *Compare* 2025 U.S. Dist. LEXIS 106786 (D. Ariz. Jun. 5, 2025) *with Coffey*, 2026 U.S. App. LEXIS 16209. The Ninth Circuit's ruling, therefore, also implicitly rejects *Jance v. Homerun Offer, LLC*, 2021 U.S. Dist. LEXIS 143145 (D. Ariz. Jul. 30, 2021), upon which *Coffey* relied, and *Aussieker v. Aghazadeh*, 2025 U.S. Dist. LEXIS 137718 (N.D. Cal. Jul. 18, 2025), which relied on *Coffey*. The in-Circuit decision *Hunsinger v. Offer, LLC*, on the other hand, was brought by a *pro se* plaintiff who did not even allege that there was any implicit or explicit offer of real estate services for sale, and instead argued that a conventional offer to purchase, itself, qualified as telemarketing. Civil Action No. 3:21-CV-2846-BH, 2022 U.S. Dist. LEXIS 234862, at *14 (N.D. Tex. Dec. 7, 2022). Thus, the court unsurprisingly ruled that that failed to state a claim under the TCPA. And *Schulz v. Infogroup, Inc.* is distinguishable on its face: it involved a company offering free business listing services to another business, in which the recipient business could not ever pay anything or exchange any consideration. Civil Action No. 3:19-CV-1620-N, 2020 U.S. Dist. LEXIS 128908, at *7 (N.D. Tex. July 21, 2020). But Plaintiffs—and other consumers—would

pay for Defendant's services in three ways: 1) the payment of a conventional commission in exchange for real estate representation on the sale of their home; 2) payment of an effective fee via the receipt of a reduced sales price on their homes to compensate Defendant for their "free" services; or 3) purchasing Defendant's services with "*property* rather than *money*." *Bramlett*, 2026 U.S. Dist. LEXIS 43946, at *4 n.2.

Here, Plaintiffs allege that Defendant's "purchase" messages are efforts to further Defendant's wholesaling effort, through which Defendant would provide a plethora of real estate related services "for free," while actually deducting the costs of those services from its purchase offers. ECF No. 1 at ¶¶ 40-44. Plaintiffs further allege that the purchase offers are themselves illusory, as they are merely a pretext to convince a homeowner to execute a contract to sell their home, which Defendant would then remarket during the closing process to third parties and either 1) assign to those buyers as the *true* buyers of the property, in exchange for a substantial fee, or 2) if no buyer can be located—or if they aren't willing to pay enough—Defendant would cancel the transaction. *Id.* at ¶¶ 29-35. These are precisely the same sorts of allegations raised in *Eagle*, *Pepper*, and *McMorrow*. Given that Defendant does not meaningfully argue otherwise—let alone address any of this directly on-point authority—the Court should deny Defendant's motion to the extent Defendant contends that Plaintiffs fail to allege the communications at issue were solicitations under the TCPA.

## II. The TCPA's private right of action applies to text messages.

Defendant next argues that text messages are excluded from the TCPA's private right of action—and most of its regulations—based on a minority view that has been *consistently* rejected by courts both within this Circuit, and nationwide. Curiously, in advancing its argument, Defendant appears to omit every single decision from within this Circuit, which this Court should

view with appropriate skepticism. *Accord Johnson v. Lumpkin*, 76 F.4th 1037, 1038 (5th Cir. 2023) (noting that when advocating for modifications in the law, "counsel is unquestionably obligated to recognize contrary authority.").

At its core, Defendant bases its argument on the Supreme Court's recent decision in *McLaughlin Chiropractic Assocs. v. McKesson Corp.*, which held in relevant part that courts would not be "bound by the FCC's interpretation of the TCPA," and that instead they "should interpret the statute as courts traditionally do under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation." 606 U.S. 146, 152 (2025). With that newfound flexibility, Defendant seeks to challenge the FCC's prior interpretation that the TCPA governs "text messages" along with "voice calls" under the term "call." More specifically, Defendant argues that 47 U.S.C. § 227(c)(5) no longer can apply to text messages, because the statute reads: "[any] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may" bring a private action based on a violation of those regulations. Defendant, in turn, argues that a text message cannot be a "call."

### A. Every court to consider this issue in the Fifth Circuit post-*McLaughlin* has held the same: "text messages" still qualify as "calls" under the TCPA.

Notably absent from Defendant's briefing on this issue is any citation to in-Circuit authority. This absence is curious, given that *seven courts within this Circuit*, in varying degrees of detail, have opined on this very subject post-*McLaughlin*. All reject Defendant's position.

First, the court in *Watkins v. EyeBuyDirect, Inc.* held, albeit in conclusory fashion, that "[a] telephone solicitation can be a call or text message." No. 1:25-CV-538-RP, 2025 U.S. Dist. LEXIS 167479, at *6 (W.D. Tex. Aug. 28, 2025) (collecting cases); *accord Crouch v. Reg'l Acceptance Corp.*, No. 3:25-cv-2162-G-BN, 2026 U.S. Dist. LEXIS 52446, at *7 (N.D. Tex. Feb. 11, 2026)

(Horan, M.J.) (also in conclusory fashion, reiterating that "'[a] text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii).'").

Then, the court in *Duron v. Kings Capital Holding LLC* provided the first detailed analysis of the issue in-Circuit post-*McLaughlin*. No. 3:25-cv-00149-DCG, 2026 U.S. Dist. LEXIS 6340, at *12 (W.D. Tex. Jan. 13, 2026). The court held, in relevant part:

> Similarly, recent TCPA jurisprudence reflects a growing split among district courts regarding whether text messages constitute "telephone calls" subject to the statute's Do-Not-Call provisions under 47 U.S.C. § 227(c). In J*ones v. Blackstone Medical Services, LLC*, the Central District of Illinois dismissed a TCPA class action, holding that § 227(c)'s plain text, which was enacted before the advent of text messaging, does not encompass text messages, notwithstanding prior FCC guidance to the contrary. That court relied heavily on the Supreme Court's recent decisions in *McLaughlin Chiropractic Assocs. v. McKesson Corp.*, and *Loper Bright Enters. v. Raimondo*, which rejected *Chevron* deference and clarified that district courts are not bound by agency interpretations but must instead apply ordinary tools of statutory construction.
>
> By contrast, other courts continue to hold that § 227(c) applies to text messages. Further, interpreting § 227(c) to include text messages is consistent with guidance from the [FCC]. The FCC has stated that § 227(b) 'encompass[es] both voice calls and text calls.'" Likewise, the FCC has stated that § 227(c) includes text messages.
>
> Moreover, interpreting § 227(c) to include text messages is consistent with numerous district court decisions. Appellate authority likewise supports this interpretation. The Ninth Circuit has held that a phone owner or subscriber whose number is listed on the National Do-Not-Call Registry and who receives unsolicited telemarketing text messages has standing under § 227(c). Other courts have similarly concluded that the receipt of unsolicited telemarketing text messages constitutes a cognizable injury under the TCPA.
>
> Ultimately, the Court's interpretation aligns with the weight of authority, confirming that text messages are actionable under § 227(c)(5).

*Id.* at *11-13; *see also Callier v. United Fundings Ltd. Liab. Co.*, No. 3:24-CV-00363-LS-MAT, 2026 U.S. Dist. LEXIS 83725, at *19 (W.D. Tex. Apr. 15, 2026) (reaching the same conclusion, for the same reasons).

Then, in an even more-detailed opinion, the Chief Judge Randy Crane of the Southern

District of Texas broached the same issue in *Alvarez v. Fiesta Nissan, Inc.*, No. 7:25-CV-00343, 2026 U.S. Dist. LEXIS 14155 (S.D. Tex. Jan. 26, 2026). In addressing the language of the statute, the court analyzed how the term "telephone call" would be understood in 1991, concluding that because "every statute's meaning is fixed at the time of enactment," "[t]he question, then, is whether the concept of a 'text message" is fairly embraced by the meaning of 'telephone call' in 1991. Looking to a dictionary contemporaneous with the TCPA's passage, the relevant definition of 'call' was 'to get or try to get into communication by telephone.'" *Id.* at *9-10 (citing Webster's Ninth New Collegiate Dictionary 197 (1990)). The court found that definition to be "capacious," and that "a plain-language reading suggests that to send a text message is to 'try to get or to get into communication by telephone.'" *Id.* at *10.[3]

The *Alvarez* court continued its analysis, noting that its interpretation of the statute comports with the context of the statute itself. First, § 227(c)(5) " confers a private right of action for 'violation of the regulations prescribed *under this subsection*'", which encompassed "telephone solicitations": the "'initiation of a telephone call *or message* for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person.' This language is broad, coloring the cause of action and the entire subsection it enforces." *Id.* at *15 (further noting that "Congress added that definition later, after text messaging had become commonplace."). Second, and equally critical, is that "Section 227(b) of the TCPA uses the same term—'telephone call'—as it does in § 227(c)," which is important because "the FCC as well as myriad courts have for years interpreted 'telephone call' in § 227(b) to include text

[3] The court also noted that "use of the verb 'to text'—now ubiquitous—had no such meaning in 1991. However, that does not mean it could not have been encompassed by the meaning of 'telephone call.' Indeed, the term 'text message' only seems distinct from the idea of a 'telephone call' today because the former term developed in our language specifically to distinguish a text communication from a voice communication." *Id.* at *8-9.

messages," which includes explicit ratification by Congress. *Id.* at *16 (citing the *Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act,* PL 116-105 (December 30, 2019)). Thus, for all of those reasons, the court found that § 227(c)(5) of the TCPA continued to apply to text messages.

Shortly thereafter, Chief Judge Shelly Dick of the Middle District of Louisiana fully embraced the decision in *Alvarez*, concluding that "Subsection 227(c)(5) applies to cell phone text messages." *McGonigle v. Shopperschoice.com, L.L.C.*, No. 25-152-SDD-RLB, 2026 U.S. Dist. LEXIS 30157, at *11 (M.D. La. Feb. 13, 2026). Magistrate Judge Torres recently ruled similarly in *Callier v. Am. Auto Grp. Ltd. Liab. Co.*, No. 3:25-CV-00231-LS-MAT, 2026 U.S. Dist. LEXIS 120642, at *18 (W.D. Tex. May 29, 2026) ("The Court is persuaded by the reasoning of the overwhelming majority of cases confirming cell phones are residential phones for purposes of the act and more importantly, that text messages are actionable under §227(c)(5).").

It bears repeating: *Defendant discusses none of these cases*. Rather, it points to a couple out-of-Circuit decisions which are a clear minority nationwide. Nationally, even more courts have rejected Defendant's precise argument—including the Ninth Circuit—which Defendant also omits.[4] This Court should not credit these likely-tactical omissions, and should embrace the

[4] *See, e.g.*, *Howard v. Republican Nat'l Comm.*, 164 F.4th 1119 (9th Cir. 2026); *Cupp v. Ta Fintech, Inc.*, No. 25-cv-07479-TSH, 2026 U.S. Dist. LEXIS 120944, at *7 (N.D. Cal. June 1, 2026); *Wilson v. Easy Spirit, LLC*, No. 3:25-CV-112 (SFR), 2026 U.S. Dist. LEXIS 69059, at *12 (D. Conn. Mar. 31, 2026); *Wilson v. Better Mortg. Corp.*, 811 F. Supp. 3d 631 (S.D.N.Y. 2025); *Newell v. Child.'s Dental Health Assocs., LLC*, No. 25-5238, 2026 U.S. Dist. LEXIS 74360, at *15 (E.D. Pa. Apr. 6, 2026); *Rubin v. Staples, Inc.*, No. 2:2545515 (WJM), 2026 U.S. Dist. LEXIS 70359, at *17 (D.N.J. Mar. 31, 2026); *Cole v. C/T Install Am., LLC*, No. 25-3531, 2026 U.S. Dist. LEXIS 63254 (E.D. Pa. Mar. 23, 2026); *King v. Charge*, No. 25-cv-00105-SB, 2025 U.S. Dist. LEXIS 267318, at *29 (D. Del. Dec. 30, 2025); *Mey v. Liberty Home Guard, LLC*, No. 5:23-CV-281, 2026 U.S. Dist. LEXIS 739, at *20 (N.D.W. Va. Jan. 5, 2026); *Hernandez v. Bedford Dental L.L.C.*, No. 25 CV 6787, 2026 U.S. Dist. LEXIS 23208, at *3 (N.D. Ill. Feb. 4, 2026); *Mujahid v. Newity, LLC*, No. 25 C 8012, 2025 U.S. Dist. LEXIS 221088, at *8 (N.D. Ill. Nov. 10, 2025); *Rabbitt v. Rohrman Midwest Motors, Inc.*, No. 25 C 11312, 2026 U.S. Dist. LEXIS 66266 (N.D.

reasoning employed by every other court in this Circuit in rejecting Defendant's argument.

### B. In addition to the unanimous view of courts in the Fifth Circuit post-*McLaughlin*, several substantive reasons support text messages qualifying as "calls" under the TCPA.

In addition to the arguments made by the courts discussed *supra*, several independent points bear additional emphasis. First, it is undisputed that the TCPA has been interpreted to govern text messages and voice calls alike—with each qualifying as "calls" under both §§ 227(b) and (c)(5)—ever since the FCC determined that to be the case in its 2003 implementation of the DNC Registry. *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd 14014, 272 (2003). Regardless of whether the FCC's ruling is strictly binding, Congress endorsed it via its subsequent amendments: "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978). After the 2003 FCC Order was issued, Congress amended the TCPA at least *four times*. *See* Pub. L. No. 109-21 (July 9, 2005); Pub. L. No. 111-331 (December 22, 2010); Pub. L. No. 114-74 (November 2, 2015);

---

Ill. Mar. 27, 2026); *Cupp v. TA Fintech, Inc.*, No. 25-cv-07479, 2026 U.S. Dist. LEXIS 66678, at *4 (N.D. Cal. Mar. 27, 2026); *Soale v. eXp Realty LLC*, No. CV-25-00773-PHX-GMS, 2026 U.S. Dist. LEXIS 47597, at *6 n.3 (D. Ariz. Mar. 9, 2026); *Rocha v. All Things Go, LLC*, No. 1:25-cv-00741-JLT-SAB, 2026 U.S. Dist. LEXIS 33294, at *8 (E.D. Cal. Feb. 18, 2026); *Mancilla v. Ultimate Fitness Grp. LLC*, No. CV-24-00568-TUC-RM (JR), 2026 U.S. Dist. LEXIS 13677, at *12 (D. Ariz. Jan. 26, 2026); *Wilson v. Mountainside Fitness Acquisition LLC*, No. CV-25-01481-PHX-MTL, 2026 U.S. Dist. LEXIS 4157, at *14 (D. Ariz. Jan. 9, 2026); *Dilanyan v. Hugo Boss Fashions, Inc.*, No. 2:25-cv-05093-JLS-BFM, 2025 U.S. Dist. LEXIS 254358, at *8 (C.D. Cal. Dec. 3, 2025); *Esquivel v. Mona Lee, Inc.*, No. 3:25-cv-00607-H-BLM, 2025 U.S. Dist. LEXIS 230841, at *8 (S.D. Cal. Nov. 24, 2025); *Wilson v. MEDVIDI Inc.*, No. 5:25-cv-03996-BLF, 2025 U.S. Dist. LEXIS 198827, at *8 (N.D. Cal. Oct. 7, 2025); *Wilson v. Skopos Fin., LLC*, No. 6:25-cv-00376-MC, 2025 U.S. Dist. LEXIS 138638 (D. Or. July 21, 2025); *Taylor v. Cider (US) Holding Ltd.*, No. 25-cv-24496, 2026 U.S. Dist. LEXIS 6252, at *6 (S.D. Fla. Jan. 13, 2026); *Glasel v. Office Depot, LLC*, No. 9:24-cv-80910-WPD, 2025 U.S. Dist. LEXIS 231053, at *6 (S.D. Fla. Nov. 25, 2025); *McGonigle. v. Office Depot, LLC.*, No. 25-80069-CIV-DIMITROULEAS, 2025 U.S. Dist. LEXIS 231061, at *6 (S.D. Fla. Nov. 25, 2025); *Bosley v. A Bradley Hosp. LLC*, No. 25-cv-22336, 2025 U.S. Dist. LEXIS 183986, at *12 (S.D. Fla. Sep. 18, 2025).

Pub. L. No. 116-105 (December 30, 2019). The Court should therefore assume that Congress intended to retain the FCC's interpretation of the TCPA and the DNC Registry. *Lorillard, Div. of Loew's Theatres, Inc. v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."); *see also Overstreet ex rel. NLRB*, 668 F. Supp. 2d 988, 1001 (W.D. Tex. 2009) ("Congress amended section 3(d) but did not alter the relevant portions of section 3(d). Congress thereby agreed that section 3(d) permits the Board to delegate to the General Counsel its section 10(j) authority.").

Second, around the time of the TCPA's enactment, the term "call" was defined as a communication by telephone. *See, e.g.*, Webster's Third New International Dictionary 318 (1981) ("call" means a "communicat[ion] with or [an attempt] to get in communication with a person by telephone"); The New Merriam-Webster Dictionary (1989) ("to get or try to get in communication by telephone"); Oxford English Dictionary, 2d Ed. (1989) ("a summons or communication by telephone"). Text messaging falls squarely within these definitions. Defendant seeks to escape this conclusion by arguing that text messaging did not exist at the time of the TCPA's enactment, but that overly-myopic view ignores that statutes can apply to newer technologies, so long as it fits within the intended meaning of the statute. As the Supreme Court explained:

> While every statute's meaning is fixed at the time of enactment, new applications may arise in light of changes in the world. So "money," as used in this statute, must always mean a "medium of exchange." But what qualifies as a "medium of exchange" may depend on the facts of the day. Take electronic transfers of paychecks. Maybe they weren't common in 1937, but we do not doubt they would qualify today as "money remuneration" under the statute's original public meaning. The problem with the government's and the dissent's position today is not that stock and stock options weren't common in 1937, but that they were not then—and are not now—recognized as mediums of exchange.

*Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018).

Thus, although text messaging may have been a newer method of communicating with someone via telephone, it is certainly within the scope of the TCPA's intended regulation, and fits within its text. This is further supported by the fact that the TCPA was also *intended* to be adaptable and applicable to emerging technologies. *See, e.g.*, 137 Cong. Rec. S18784 (1991) (statement of Sen. Hollings) ("The FCC is given the flexibility to consider what rules should apply to future technologies as well as existing technologies.").

Third, Defendant confusingly argues that the 2018 amendments to the TCPA implied that Congress *secretly* meant to eliminate TCPA protections from text messages based on the language at 47 U.S.C. § 227(e)(8)(A)-(B), which addresses both "a call made using a voice service" and "a text message sent using a text message service." Defendant contends that this language shows an intent to treat text messages differently from voice calls, but it actually reinforces the opposite conclusion: if a "call" is only a "call made using a voice service"—as Defendant contends—why would "using a voice service" be used to modify the word "call"? In other words, as Defendant would read it, the regulation would essentially say "*a call [with a voice service] made using a voice service*," which injects nonsensical redundancies.[5] Rather, it is clear that Congress necessarily acknowledged that the term "call" is broader than voice-only communications. And were that not enough, the court in *Rabbitt v. Rohrman Midwest Motors, Inc.* recently noted that these very same amendments support the conclusion that Congress intended to maintain the application of the TCPA to "text messages":

> That Congress did not change anything about §227(c) in the 2018 amendments can be read to represent exactly the opposite of what defendant advocates. In light of the regulatory history and case law that was known to Congress in 2018, Congress had the option to take affirmative action to exclude text messages from § 227(c)'s

---

[5] Moreover, the entire argument is a misnomer, as the statutory language at issue was only added to address "caller identification" requirements, which, again, implies that text messages can be "calls" if they are subject to "*caller* identification" rules.

> coverage. Congress did not do so. If Congress's inaction in 2018 is to be ascribed any meaning, the court interprets it as an acceptance of the existing case law and regulations that applied §227(c) to text messages. This read on Congress's inaction is in harmony with the oft-repeated principle that statutory stare decisis is particularly strong, because Congress can change what the courts have concluded.

No. 25 C 11312, 2026 U.S. Dist. LEXIS 66266, at *9 (N.D. Ill. Mar. 27, 2026) (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 274 (2014)).

Fourth, to the extent Defendant asserts that voice calls were deemed to be the exclusive means of communication subject to the TCPA's "call" restrictions, that would be false, even from the inception of the TCPA. 47 U.S.C. § 227(b)(1)(A) uses the word "call" several times to describe a prohibited transmission to both a "cellular telephone" and "a paging service." A typical paging device in the early 1990s would have displayed an incoming message as written text, usually a phone number to call.[6] It follows, therefore, that such use of the word "call" must have encompassed text transmissions; reading the identical use of the word "call" in the TCPA's subsections *differently* would thus violate "the basic canon of statutory construction that identical terms within an Act bear the same meaning." *See Est. of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479 (1992).

In sum, it is important to emphasize that in *McLaughlin*, the Supreme Court[7] did not instruct courts to completely jettison the opinions and regulatory work of agencies like the FCC;

---

[6] *See, e.g.*, Paging Network, Inc., Annual Report, at 8 (1993), available at https://digital.library.mcgill.ca/images/hrcorpreports/pdfs/6/639549.pdf (last visited May 27, 2026).

[7] Notably, the Supreme Court has also affirmed that "[a] text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of §227(b)(1)(A)(iii)." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016). To the extent that Defendant argues such language to be mere dicta, "lower courts 'are generally bound by Supreme Court dicta,'" and it "cannot be lightly cast aside." *Miller v. Comm'r of Soc. Sec.*, Civil Action No. 4:21-cv-01007-O-BP, 2023 U.S. Dist. LEXIS 97070, at *17 (N.D. Tex. June 5, 2023) (O'Connor, J.).

rather, it ordered "appropriate respect" for those decisions. 606 U.S. at 168. Defendant's argument, at its core, seeks to abandon *any* pretense of respect for the FCC's interpretations, ignore abundant in-Circuit precedent, and replace the statutory interpretation of the FCC and courts nationwide with another interpretation that *clearly* defies Congress' intent in enacting the TCPA. The Court should decline Defendant's invitation and deny Defendant's motion to the extent it seeks to upend decades of the TCPA's application to text messages and voice calls alike.

**III. There is a private right of action under the TCPA for violations of the DNC Registry, and that has been the case for decades.**

As a final argument, Defendant embraces a novel argument; one so novel, that it seeks to reverse over twenty years of jurisprudence concerning the TCPA, all without citing to a single case embracing its reasoning. This is because Defendant's argument—which essentially boils down to a demand that this Court remove any private right of action from violations of the DNC Registry due to the timing of its implementation—is half-baked, and directly refuted by Supreme Court precedent.

**A. Defendant's argument that the FCC's failure to implement the DNC Registry in 1992 precluded its later implementation is flatly rejected by Supreme Court precedent.**

First, Defendant argues that the FCC lacked authority to implement the DNC Registry, and its related regulations, any time after September 20, 1992, based on language in 47 U.S.C. §§ 227(c)(1)-(2) which state, respectively, that "within 120 days [of December 20, 1991] . . . the Commission shall initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object," and "[n]ot later than 9 months after [December 20, 1991] the Commission shall conclude the rulemaking proceeding initiated under paragraph (1) and shall prescribe regulations to implement methods and procedures for protecting the privacy rights described in such paragraph."

That did not happen in 1992, *see* 67 FR 62667, 62676 ¶ 41,[8] and so Defendant's argument goes, the FCC missed its original 1992 statutory deadline to create the DNC Registry, and only did so in 2003 following the Do-Not-Call Implementation Act, 15 U.S.C. § 6153 ("DNC Act"), the DNC Registry was prescribed under the 2003 Act (which lacks a private right of action) rather than the TCPA.

Initially problematic for Defendant's position is that timing instructions in statutes like the TCPA do not prevent actions taken subsequent to that deadline unless that consequence is made explicit in the statute, as the Supreme Court has *repeatedly* confirmed. First, in *Brock v. Pierce Cty.*, the Supreme Court held: "We would be most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake. When, as here, there are less drastic remedies available for failure to meet a statutory deadline, courts should not assume that Congress intended the agency to lose its power to act." 476 U.S. 253, 260 (1986). This was separately and clearly reaffirmed in *Barnhart v. Peabody Coal Co.* 537 U.S. 149, 158 (2003) ("Nor, since *Brock*, have we ever construed a provision that the Government 'shall' act within a specified time, without more, as a jurisdictional limit precluding action later."). Simply put, "if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction." *United States* v. *James Daniel Good Real*

---

8 The DNC Registry was not initially implemented in 1992 primarily due to technological constraints, given the modern commercial internet was not used by the general public, and so there was no straightforward way for consumers to register on such a registry nor for companies to regularly access that registry, as it would have required widespread data distribution by physical means (such as via vast boxes of floppy disks or massive paper printouts). *See generally id.*; Rodney A. Smolla, *The "Do-Not-Call List" Controversy: A Parable of Privacy and Speech*, 38 Creighton L. Rev. 743, 745 (2005) ("*Smolla*"). Rather, in 1992, "the new rules required telemarketers to adopt company-specific Do-Not-Call lists." *Id.*

*Property*, 510 U.S. 43, 63 (1993) (collecting cases). The Fifth Circuit recently cited this very same authority and reiterated the same principles in *Texas v. United States EPA*, 156 F.4th 523, 539 (5th Cir. 2025).

With that context in tow, nowhere in 47 U.S.C. § 227(c)—or any other part of the TCPA, nor any legislative record—did Congress state that the FCC would lose its regulatory authority over consumer privacy or implementing the DNC Registry if it failed to enact a registry in 1992. Thus, Defendant's desired outcome—a ruling that the FCC lacked authority to implement the DNC Registry pursuant to the TCPA *due to timing*—is directly refuted by both Supreme Court and Fifth Circuit precedent, and lacks any support within the text of the statute itself. And, as explained in greater detail below, Congress has amended and iterated the TCPA repeatedly since 1993 without once suggesting that the FCC could not implement the DNC Registry due to timing. Rather, the DNC Act instructed the FCC to implement the DNC Registry—in 2003—pursuant to the authority provided to the FCC under the TCPA. Pub. L. No. 108-10, 117 Stat. 557 (2003) ("the [FCC] shall issue a final rule pursuant to the rulemaking proceeding that it began on September 18, 2002, under the [TCPA]."). Thus, arguing that the FCC lost the power to do so is inconsistent with the instruction of Congress.

### B. The 2003 Do-Not-Call Implementation Act, the FCC's 2003 implementation of the DNC Registry, and decades of caselaw make clear that the DNC Registry is and was enacted pursuant to the FCC's authority under § 227(c).

Turning to the actual implementation of the DNC Registry in 2003, Defendant's position falls apart even further. In 2002, technology had caught up, the rise of the internet solved the data management challenges associated with the DNC Registry, and "the FCC appeared to realize that its company-specific approach had failed to provide adequate privacy protection to consumers, and the Commission issued a Notice of Proposed Rulemaking requesting comment on whether the

Commission should revisit its decision regarding the establishment of a national do-not-call list." *Smolla*, at 746; *see also In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 17 FCC Rcd 17459 (Sept. 18, 2002) ("we seek comment on whether the Commission's rules need to be revised in order to more effectively carry out Congress's directives in the TCPA"). In parallel, the Federal Trade Commission ("FTC") issued a Notice of Proposed Rulemaking that recommended the creation of the DNC Registry, and in January 2003, the FTC issued final rules regarding the same, which were codified and endorsed by Congress via the DNC Act. Shortly thereafter, the FCC followed suit, and adopted rules that mirrored the FTC's. *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd 14014, ¶ 2 (July 3, 2003) (the "2003 Order") ("the [DNC Act] authoriz[ed] the establishment of a national do-not-call registry, and direct[ed] this Commission to issue final rules in its second major TCPA proceeding that maximize consistency with those of the FTC."). In fact, the DNC Act was passed in order to coordinate the FCC and FTC's actions to "maximize consistency" between the FTC's and FCC's DNC Registry actions. *Id.* at ¶ 15.

In formally enacting the DNC Registry via the 2003 Order, the FCC expressly explained that it was doing so pursuant to § 227(c) of the TCPA, *id.* at ¶ 16, and that "[p]ursuant to our authority under section 227(c), we adopt a national do-not-call registry that will provide residential consumers with a one-step option to prohibit unwanted telephone solicitations." *Id.* at ¶ 28. In doing so, the FCC noted that the DNC Registry itself would "be maintained by the FTC," and further noted that "Congress has recently affirmed its support of a national do-not-call registry in approving funding for the FTC's national database." *Id.*

With that context in tow, Defendant's argument is, at best, confusing. Setting aside the timing-related argument for a moment, Defendant appears to contend that the DNC Act was an act

of Congress *overruling* the FCC's prior decision to not implement the DNC Registry in 1992 due to practicality constraints. *See* ECF No. 11 at 25 ("Congress provided the FCC with discretion over the decision of whether or not to establish the NDNC. The agency exercised that discretion and opted not to establish [the DNC Registry] within the time permitted by Congress to do so. In response to the FCC's exercise of that discretion, Congress took independent steps which ultimately culminated in the NDNC's creation."). But that blurs and misstates the timeline—as the FCC and FTC took action regarding the DNC Registry prior to the DNC Act. *Compare* 17 FCC Rcd 17459 (the 2002 FCC notice) *with* https://www.congress.gov/bill/108th-congress/house-bill/395/all-actions (the DNC Act's legislative history). Rather, the implementation of the DNC Registry was a continuous process where the FCC, FTC, and Congress worked in concert—not opposition.

Additionally, Defendant prefaces the implementation of the DNC Registry and the DNC Act as taking place "[a]gainst a backdrop of uncertainty as to the FTC's legal authority to establish a national do-not-call registry." ECF No. 11 at 26. This assertion is uncited conjecture, as Defendant does not cite any purported uncertainty nor any Congressional record supporting it.

Next, Defendant contends that the DNC Registry's implementing regulations do not comply with 47 U.S.C. § 227(c)(3). This argument is undeveloped, conclusory, and at times nonsensical, as it asserts that the various regulations at issue contained with 47 C.F.R. § 64.1200 "fail to comply with the statute" without explaining how, or without discussing the FCC's detailed analysis of this very question that took place decades ago. To be sure, the FCC explained, in its 2003 Order, how its DNC Registry regulations comply with each of the requirements of § 227(c)(3) over the course of nearly ten pages of discussion. *See* 2003 Order at ¶¶ 55-62. Defendant does not argue that the FCC's analysis was wrong; rather, it falsely suggests it does not exist.

Lastly, despite being enforced for over 20 years, and despite the hundreds, if not thousands, of cases—from district courts to the Supreme Court—addressing claims for violations of the DNC Registry via the private right of action in § 227(c)(5), Defendant does not cite a single case for its argument that the DNC Registry lacks a private right of action under the TCPA. No such case appears to exist. Rather, the Supreme Court has acknowledged that § 227(c)(5) "authorizes a private right of action for a violation of the FCC's implementing regulations," while noting that the TCPA "directs the FCC to prescribe regulations to protect the privacy of residential telephone subscribers" via the DNC Registry. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 373-74 (2012). Every Circuit Court to discuss the issue agrees. *See, e.g.*, *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 649 (4th Cir. 2019) ("the law allows a private right of action for violations of the Do-Not-Call registry regulations"); *Murray v. Grocery Delivery E-Services USA Inc.*, 55 F.4th 340, 347 (1st Cir. 2022) (same, discussing elements of claim); *Jones v. Montachusetts Reg'l Transit Auth.*, No. 22-1569, 2023 U.S. App. LEXIS 35000, at *2 (1st Cir. Nov. 30, 2023) ("§ 227(c)(5) of the TCPA . . . allows a private right of action for violations of the national do-not-call registry regulations"); *Barton v. JMS Assoc. Mktg., LLC*, No. 21-35836, 2023 U.S. App. LEXIS 3593, at *3 (9th Cir. Feb. 15, 2023) (same); *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1265 (11th Cir. 2019) (same).

Unsurprisingly, then, courts within the Fifth Circuit, including this Court, also agree. *See, e.g.*, *Starling v. J Wales Home Sols. LLC*, Civil Action No. 4:21-cv-01261-O, 2022 U.S. Dist. LEXIS 71382, at *8 (N.D. Tex. Apr. 19, 2022) (O'Connor, J.) ("Section 227(c)(5) creates a cause of action for any 'person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection.' The regulations, in turn, prohibit telephone solicitation to anyone 'who has registered

his or her telephone number on the national do-not-call registry.'"); *Hunsinger v. Dynata LLC*, No. 3:22-cv-00136-G-BT, 2023 U.S. Dist. LEXIS 37879, at *11 (N.D. Tex. Feb. 7, 2023) (Rutherford, M.J.) (noting that § 227(c) "regulates calling practices to protect rights of privacy of those registered on the DNC list"); *Callier v. Settle Fast McA, Ltd. Liab. Co.*, No. 3:24-CV-00461-KC, 2026 U.S. Dist. LEXIS 10096, at *5-6 (W.D. Tex. Jan. 20, 2026) (same).

Defendant faced a hefty burden in seeking to upend decades of *stare decisis* and the entire operation of the DNC Registry and a vast portion of the TCPA. Defendant did not come close to meeting that burden, as it addressed *none* of the on-point caselaw, and fundamentally rests on a misunderstanding of the impact of the timing language contained within the TCPA despite directly on-point Supreme Court and Fifth Circuit guidance. Were that not enough, Defendant further buries its head within the sand while pretending the regulations at issue do not comply with § 227(c)(3) despite the detailed discussion by the FCC regarding how they do. The Court should accordingly deny Defendant's motion to dismiss on the absurd basis that the DNC Registry lacks a private right of action.

**Conclusion**

As Justice Kavanaugh acknowledged, "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls." *Barr v. Am. Ass'n of Political Consultants*, 591 U.S. 610, 613 (2020). Defendant's wanton disregard of the DNC Registry, and its desire to inundate consumers with mass telemarketing messages without regard to their status on the DNC Registry nor attempting to obtain their consent, must not be excused nor rewarded. The Court should accordingly deny Defendant's motion to dismiss in its entirety.

Date: June 9, 2026.

*<u>/s/ Bryan A. Giribaldo</u>*
Bryan A. Giribaldo
Texas Bar No. 24124547
Alex D. Kruzyk* (application for admission

pending)
Texas Bar No. 24117430
**PARDELL, KRUZYK & GIRIBALDO, PLLC**
7500 Rialto Blvd., Suite 1-250
Austin, Texas 78735
Tele: (561) 726-8444
bgiribaldo@pkglegal.com
akruzyk@pkglegal.com

*Counsel for Plaintiffs and the proposed class*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 9, 2026, I caused the foregoing to be filed electronically with the Clerk of Court and to be served via the CM/ECF Filing System upon all counsel of record.

By: *\/s/ Bryan A. Giribaldo*
Bryan A. Giribaldo