**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

Robert Mossbruger, Michael Mossbruger, and Joseph Mossbruger, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

FCREI Properties, LLC d/b/a Ultra Modern Investments,

Defendant.

Case No. 3:26-cv-00889-O

**DEFENDANT FCREI PROPERTIES, LLC D/B/A ULTRA MODERN INVESTMENTS' REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS**

## PRELIMINARY STATEMENT

Plaintiffs have failed to plead facts which plausibly establish that: (1) Defendant's purchase inquiries constitute "telephone solicitations" for TCPA[1] purposes; (2) text messages are "telephone calls" under § 227(c)(5); or (3) there is a private right of action for alleged violation of 47 C.F.R. § 64.1200(c) despite the regulation having been promulgated pursuant to a grant of authority through a statute which does not confer a right of action. Defendant respectfully urges the Court to dismiss all claims given the opposition's unpersuasive attempts to buttress the Complaint's otherwise conclusory statements and legal characterizations, and disregard of the pleading's fundamental defects, including the following:

First, because 47 U.S.C. § 227(a)(4) defines "telephone solicitation" in discrete terms which require that the recipient be encouraged to part with his/her money by making a purchase, rental, or investment in property, goods, or services, the subject text messages facially demonstrate that they do not constitute "telephone solicitations." Even if the Court were to accept Plaintiffs' characterization of UMI as a "real estate wholesaler," the Complaint unequivocally demonstrates that UMI was inquiring about purchasing Plaintiffs' properties and there is nothing about the content nor the context of the subject messages which plausibly suggest that the purpose of those messages was to encourage Plaintiffs to provide any money to UMI. Simply stated, the only proposal UMI made to Plaintiffs concerned their willingness to sell their property to UMI. In the absence of any marketing of services, let alone any encouragement of Plaintiffs to make a purchase of *anything* from UMI, the messages are not telephone solicitations.

Second, while the issue of whether text messages are telephone calls for purposes of 47 U.S.C. § 227(c)(5)'s private right of action is a matter of first impression for this Court and has

[1] Defendant incorporates all defined terms as they were defined in the Brief in Support of Defendant's Motion to Dismiss. ECF 11.

not been considered by the Fifth Circuit, the logic underpinning the conclusion of those courts which have determined that text messages are not telephone calls is not persuasively refuted by the out-of-district cases relied upon by Plaintiffs in favor of the opposite determination. The words "text message," "message," and "telephone solicitation" are absent from § 227(c)(5). It would require judicial activism from this Court, inserting insert language into the statute that Congress saw fit not to use, to conclude that text messages are telephone calls for purposes of § 227(c)(5).

Third, despite admitting that the NDNC was established pursuant to the DNC Act and that DNC Act directed the FCC to issue final rules concerning the NDNC, Plaintiffs obfuscate as it relates to the ultimate issue regarding the absence of a right of action conferred in the DNC Act. However, because it was the DNC Act which was the statutory grant of rulemaking authority by which the FCC issued its NDNC-related rules, and because the DNC Act does not provide a private right of action, Plaintiffs' claims alleging violation of the FCC's NDNC -related regulations must be dismissed.

**ARGUMENT**

**I. COMMUNICATIONS THAT DO NOT ENCOURAGE THE RECIPIENT TO PART WITH MONEY ARE NOT TELEPHONE SOLICITATIONS**

The TCPA defines "telephone solicitation" as the initiation of a telephone call "for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 U.S.C. § 227(a)(4).

Therefore, in order to be a statutory telephone solicitation, the definition requires that the purpose of a communication's initiation must be to encourage the recipient to part with their money, whether through the purchase or rental of, or investment in, property, goods, or services. In opposition, Plaintiffs make no attempt to distinguish the cases UMI cited in which *this Court*

has, on this very basis, concluded that offers to purchase are not telephone solicitations. *See Hunsinger v. Offer, LLC*, 2022 U.S. Dist. LEXIS 234862 (N.D. Tex. Dec. 7, 2022) (adopted by 2023 U.S. Dist. LEXIS 2384 (N.D. Tex. Jan. 6, 2023)) (adopting recommendation that TCPA claims be dismissed because "the purpose of the defendant's calls to him was to seek the purchase of his home; he did not allege that the purpose was to induce him to make a purchase from the defendant."); *see also Schulz*, 2020 U.S. Dist. LEXIS, at *8 (dismissing TCPA claim because none of the calls encouraged the purchase or rental of, or investment in property, goods, or services).

Instead, Plaintiffs cite to out-of-district cases contradicting the conclusions reached by this District, while asking that the Court indulge in their supposition as to the subjective intent of the subject text messages based on conclusory descriptions of UMI's business model. However, precedent from this Court is clear that offers to purchase do not constitute telephone solicitations under the TCPA. Moreover, Plaintiff's speculative theories concerning UMI's business model are alternatively conclusory, susceptible to collapse upon examination, and most importantly, do not otherwise convert offers to purchase into offers to sell. As such, the Complaint must be dismissed.

**A. The Complaint's "Conventional Real Estate Representation" Theory Is Conclusory.**

Plaintiffs now argue that UMI sent texts for the dual purpose of (1) providing conventional real estate listing services, and (2) real estate wholesaling.[2] As to the first theory, the Complaint's supporting allegations are reduced to a handful of conclusions: that UMI "seeks to identify consumers interested in conventional real estate representation and thereafter refer those consumer leads to real estate agents." ECF No. 1 at ¶¶ 27-28. But Plaintiffs never received any

[2] To the extent Plaintiffs attempt to amend their allegations through their response to UMI's Motion to Dismiss, these allegations must be disregarded. *See Crouch v. Reg'l Acceptance Corp.*, No. 3:25-cv-2162-G-BN, 2026 U.S. Dist. LEXIS 52446, at *4 ("[p]laintiffs may not amend their allegations through a response to a motion to dismiss.").

communications referencing real estate agent services, commissions, or listings. To the contrary, the messages they actually received were simple inquiries about purchasing Plaintiffs' properties. Moreover, Plaintiffs do not allege or plausibly plead that UMI sold their information as leads to real estate agents.

Rather, Plaintiffs allege that "Defendant offers to handle all the paperwork and work with reputable title companies to ensure a smooth closing." However, they do not allege that UMI was compensated for either handling the paperwork or from title companies. And, again, the text messages themselves do not make any reference to title companies or real estate services – they straightforwardly inquire of Plaintiffs' openness to receive an offer to purchase their property.

The Complaint's references to Defendant's Facebook page and website, unverified consumer reviews, and trademark filings do not otherwise transform the subject text messages from offers to purchase into offers to sell. Absent actual allegations of facts which connect UMI's general business activities to the communications at issue, Plaintiffs have failed to plausibly allege receipt of statutory telephone solicitations. *See Schulz v. Infogroup, Inc.*, 2020 U.S. Dist. LEXIS 128908, at *7 (N.D. Tex. July 21, 2020).

### B. The Wholesaling Theory Does Not Satisfy the TCPA's Definition of Telephone Solicitation.

Without binding, in-district cases on which to rely, Plaintiffs lean heavily on *Eagle v. GVG Cap., LLC,* 2023 U.S. Dist. LEXIS 15834 (E.D. Mo. Jan. 31, 2023) and *Pepper v. v. GVG Cap. LLC*, 677 F. Supp. 3d 638 (S.D. Tex. 2023), for the proposition that wholesaling constitutes telemarketing. But these cases are inapposite to the facts at issue.

In *Eagle*, the denial of the notion to dismiss was because the complaint alleged that the text messages themselves offered home selling services to plaintiff, and the defendant sought to submit her information for lead generation services. The allegations regarding defendant's website thus

bolstered factual allegations concerning the content of the messages, and together plausibly plead a telephone solicitation under the TCPA. 2023 U.S. Dist. LEXIS 15834, at *8.

In *Pepper*, the court found allegations sufficient to withstand a motion to dismiss where it was pled that the defendant was compensated for providing real estate transaction services. Importantly, however, the *Pepper* court stated that "it is not persuaded that an offer to buy a home "as-is" amounts to a solicitation prohibited by the TCPA." 677 F. Supp. 3d 638, 642 (S.D. Tex. 2023). This is notable because the only reasonable conclusion to reach from the content of the text messages Plaintiffs received is that they contemplated offers from UMI to purchase Plaintiffs' property as-is. As simple inquiries gauging Plaintiffs' willingness to receive an offer to purchase their property, these communications did not offer any ancillary services to Plaintiffs.

More fundamentally, the "effective fee" theory advanced by Plaintiffs—that the discount from fair market value constitutes a fee for services—confuse the economics of a purchase transaction for a service relationship. Even assuming that an agreed upon purchase price can ever be deemed a discount off of fair market value where fair market value is otherwise defined as the price that a seller willingly accepts from an interested purchaser, the discount is related the buyer's assumption of risk in deploying its capital, it is not a "fee" which the buyer is paid for services rendered to the seller. Accepting Plaintiffs' theory would mean that any discounted purchase offer constitutes a TCPA solicitation, an interpretation unsupported by the statute's text.

## II. STATUTORY INTERPRETATION OF § 227(C)(5) REQUIRES FINDING THAT TEXT MESSAGES ARE NOT "TELEPHONE CALLS"

*Chevron* deference is no more and district courts "instead must determine the meaning of the law under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation." *Id.*, at *4 (citing *McLaughlin Chiropractic Associates, Inc. v. McKesson Corp.*, 606 U.S. 146, 155 (2025). Application of ordinary principles of statutory interpretation

requires the Court to conclude that 47 U.S.C. § 227(c)(5)'s private right of action does not apply to text messages and, therefore, Plaintiffs' claims must be dismissed.

**A. <u>The Plain Text of § 227(c)(5) Does Not Encompass Text Messages.</u>**

47 U.S.C. § 227(c)(5) does not include the words "text message," "message," or "telephone solicitation." It says "telephone call." Plaintiffs proffer no cases from this Court holding that § 227(c)(5) applies to text messages, and the cases they do submit are easily distinguishable.

Plaintiffs principally rely upon *Duron v. Kings Capital Holding LLC*, 2026 US Dist. LEXIS 6340 (W.D. Tex. Jan. 13, 2026) and *Alvarez v. Fiesta Nissan, Inc.*, 2026 U.S. Dist. LEXIS 14155 (S.D. Tex. Jan. 26, 2026). In *Duron*, however, the Magistrate's recommendation provided considerable deference to FCC interpretation, and cited as Circuit Court authority two Ninth Circuit cases, one of which, *Hall v. Smosh Dot Com, Inc.*, 72 F.4h 983 (9th Cir. 2023), concerned the issue of whether receipt of a text message is a sufficient injury in fact for purposes of Article III standing, while the other, *Chennette v. Porch.Com, Inc.*, 50 F.4h 1217 (9th Cir. 2022) concerned the issue of whether mixed-use phones are residential within the meaning of § 227(c). Neither case required the Appellate Court to analyze, let alone decide, the issue of whether text messages constitute telephone calls for purposes of § 227(c)(5). Moreover, deference to the FCC's interpretation need no longer be given.

In *Alvarez*, the court began by correctly observing that it is not enough to look just at the definition of "call" as it was defined at the time of the TCPA's enactment because "call" is modified by the word "telephone," and that the proper interpretation of "telephone call" requires looking at the definitions of each respective word and to view them together to reach the correct interpretation. It thereafter observed that when used as a verb, "call" meant "to get or try to get into communication by telephone," *Alvarez*, 2026 U.S. Dist. LEXIS 14155, at *10 (citing Webster's Ninth New Collegiate Dictionary 197 (1990), and that the definition of "telephone" at

the time of the TCPA's passage was "an instrument for producing sounds at a distance." *Id.* (citing Webster's Ninth New Collegiate Dictionary 1212).

From there, *Alvarez* erred by focusing on a telephone's capabilities, relying heavily on the reasoning from a Seventh Circuit decision related to a statute's malleability to accommodate technological advancements. *See Id.*, at *10-11 (citing *In re Erickson*, 815 F.2d 1090 (7th Cir. 1987)). However, down this slippery slope of statutory malleability lies inevitable absurd results, for text messages are not the only form of communication that telephones can transmit in 2026 which telephones in 1991 could not. If all that is required to fall within the definition of "telephone call" is to attempt to communicate with a person by a telephone, as *Alvarez* ultimately concluded, then email would unquestionably be subject to TCPA regulation. However, it is farcical to believe that anyone would confuse an email for a telephone call, just as it is for anyone to confuse a text message for a telephone call. In fact, on May 21, 2026, Judge Kirsch of the Seventh Circuit gave voice to the concern for this absurd result during the oral argument of *Steidinger v. Blackstone Medical Services* (25-2398) in which an appeal was taken from the dismissal of TCPA claims for failure to state a claim premised upon the determination that § 227(c)(5) does not apply to text messages.

To be sure, judicial fear of the disastrous consequences awaiting at the bottom of the slippery slope of attempting to retrofit TCPA statutory terms to extend to technological advances is not new. In *Facebook v. Duguid*, 592 U.S. 395 (2021), such fear resulted in a unanimous Supreme Court decision rejecting an expansive interpretation of the statute which had developed as a means of adapting the statute to advances in modern communications technology perceived to have outpaced the statute's reach. The Supreme Court was unmoved, however, stating that "this Court cannot rewrite the TCPA to update it for modern technology." *Id.* at 397. Just as in

*Facebook*, where the Supreme Court concluded that Congress intended what it meant in choosing the language which defined an autodialer, so too here is it apparent that Congress meant what it said in limiting the right of action in §227(c)(5) to recipients of telephone calls, and to the exclusion of messages (text or otherwise).

**B. The Court Must Conduct An Independent Analysis of the Language in 47 U.S.C. § 227(c)(5).**

Plaintiffs erroneously assert that UMI's argument that text messages are not telephone calls seeks to upend decades of the TCPA's application to text messages. To the contrary, given that much of this past precedent relied upon FCC guidance on the subject, *Loper Bright* and *McLaughlin* mandate that the Court undertake the task of independently reviewing 47 U.S.C. § 227(c)(5) under ordinary principles of statutory interpretation in this enforcement proceeding to reach an appropriate interpretation of the statute.

As Plaintiffs note, Congress has amended the TCPA on at least four occasions. They are incorrect, however, to conclude that Congress' failure to amend § 227(c)(5) to include the words "text message" or "message" reflects congressional understanding that the provision already extended to text messages. Rather, the effect of the amendments is that other subsections of the TCPA expressly apply to text messages because Congress intended for it to be so, (*see, e.g.*, 47 U.S.C. § 227(e)(8)(A) and (B), and (i)(1)(A) and (B)), while § 227(c)(5) does not, similarly because Congress intended for it to be so.

Moreover, and contrary to Plaintiffs' argument, the use of the phrase "telephone call" in §227 (b) does not alter this conclusion. As noted above, the appropriate interpretation of "telephone call" recognizes that it is an attempt to communicate with someone through a device that delivers sound from distance. As a result, "telephone call" in § 227 (b)(1)(B) is consistent with

that interpretation given that the provision concerns delivery of artificial or prerecorded *voice* messages.

For these reasons, as well as those set forth in Defendant's Motion, upon conducting its own independent interpretation of the statute to reach the appropriate conclusion that "telephone call" in § 227(c)(5) does not include text messages, the Court must dismiss Plaintiffs' claims.

## III. BECAUSE THE NDNC WAS IMPLEMENTED PURSUANT TO THE DNC ACT, THERE IS NO PRIVATE RIGHT OF ACTION FOR ALLEGED DNC VIOLATIONS

In opposition, Plaintiffs mistakenly assert that UMI makes an unsupported claim that the DNC Act was enacted against a backdrop of legal uncertainty as to the FTC's authority to establish the DNC Registry. Nevertheless, in *U.S. Sec. v. FTC*, 282 F.Supp.2d 1285 (W.D. Okla. 2003), plaintiffs challenging the FTC's action were granted summary judgment on the specific ground that the Telemarketing Act did not delegate authority to the FTC to establish the NDNC. *Id*. at 1291. Because President Bush signed the DNC shortly after the *U.S. Sec.* decision, the Tenth Circuit later vacated the ruling stating that: "in response to the district court's decision in case No. 03-6258, Congress expressly ratified the FTC's do-not-call regulations . . . The FTC's statutory authority is now unmistakably clear." *Mainstream Mktg. Servs. v. FTC*, 358 F.3d 1228, 1250 (10th Cir. 2004).

It was the FTC which created and established the DNC Registry, not the FCC. This is notable given that § 227(c)(3)'s conferral of rulemaking authority to the FCC regarding the NDNC states that the FCC's regulations may require "the establishment <u>and</u> operation" of the database. The FCC's NDNC regulations did not do the former.

Similarly, Plaintiffs do not meaningfully engage with the implications of the numerous substantive requirements enumerated by § 227(c)(3) and (4) that are facially absent from the entirety of 47 C.F.R. § 64.1200(c). Instead, they deem UMI's argument underdeveloped. To the

contrary, UMI's identification of these many absences served to underscore that the TCPA could not have been the source of the FCC's NDNC rulemaking authority because the NDNC rules failed to comply with so many of the TCPA's substantive mandates.

Instead, Plaintiffs chiefly argue that the FCC's enactment of the NDNC regulations 10 years after the lapse of the statutory deadline to do so is of no consequence because the TCPA itself does not provide a consequence for failure to timely act. While UMI recognizes that in *Brock v. Pierce County*, 476 U.S. 253 (1986) and *Barnhart v. Peabody Coal Co.*, 537 U.S. 149 (2003), the Supreme Court ruled that in the absence of statutory language indicating consequences for failure to timely act courts should be reluctant to conclude subsequent agency action is void, in both cases the Court observed that the agency's ability to timely complete its mandatory action was subject to factors beyond the agency's control, and therefore found that it was appropriate to read statutory deadlines as simply meaning to "spur the agency" to action.

However, that is not what happened with the TCPA, the FCC, and the NDNC. The TCPA gave discretionary authority to the FCC to establish the NDNC by a date certainty. It did not fail to meet the deadline due to factors beyond its control. In fact, it timely exercised its discretion - it made the affirmative decision not to establish the NDNC prior to the deadline's lapse. Neither *Brock* nor *Barnhart* therefore serve to preclude a determination that the 10-year delay in passage of the FCC's DNC Registry regulations buttresses the conclusion that its statutory authority derived from the DNC Act, not from the TCPA.

As the DNC Act does not provide for an independent private right of action, Plaintiff's claims purporting to arise from alleged violation of that regulation must be dismissed as a result.

**IV. CONCLUSION**

For the foregoing reasons, UMI respectfully requests that the Court grant the Motion, dismiss the Complaint in its entirety with prejudice, and grant such further relief as deemed proper.

DATED: June 23, 2026

Respectfully submitted,

KLEIN MOYNIHAN TURCO LLP

*Attorneys for FCREI Properties, LLC d/b/a Ultra Modern Investments*

By: */s/ Neil E. Asnen*
Neil E. Asnen (admitted *pro hac vice*)
450 7th Avenue – 40th Floor
New York, NY 10123
Telephone: (212) 246-0900
Email: nasnen@kleinmoynihan.com

-and-

VARTABEDIAN KATZ, HESTER & HAYNES

By: */s/ Richard B. Roper*
Richard B. Roper
2200 Ross Avenue – Suite 4200 West
Dallas, TX 75201
Telephone: (817) 309.9092
Email: Richard.Roper@vkhh.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 23, 2026, I electronically filed with the Clerk of Court the foregoing document using the CM/ECF system which will send notification of such filing(s) to all counsel of record.

*/s/ Richard B. Roper*
Richard B. Roper